**354**

UNITED STATES, Appellee,

v.

Wyatt L. MATTHEWS, Private First
Class, U.S. Army, Appellant.

No. 43,538.

CM 439064.

U.S. Court of Military Appeals.

Oct. 11, 1983.

Lieutenant Colonel John T. Edwards, Captain Patrick M. Flachs, Captain Richard G. Mann, Jr., Captain Eugene R. Milhizer (on brief); Colonel James Kucera.

Amici Curiae on behalf of Appellant:

Major William H. Lamb (argued); Colonel George R. Stevens (on brief); Colonel Verlin D. Dickman—For Appellate Defense Division, USAF.

Major Joseph M. Poirier, USMC (argued); Captain Walter J. Landen, Sr., JAGC, USN, Lieutenant Commander Georgia L. Winstead, JAGC, USNR (on brief)—For Appellate Defense Division, USN.

Ronald W. Meister, Esquire (argued); Eugene R. Fidell, Esquire, Steven S. Honigman, Esquire (on brief); Charles S. Sims, Esquire, Joel Berger, Esquire, John Charles Boger, Esquire, Francis R. Jones, Esquire (of counsel)—For American Civil Liberties Union Foundation, NAACP Legal Defense and Educational Fund, Inc., Committee on Military Justice and Military Affairs, Association of the Bar of the City of New York.

Samuel Dash, Esquire (argued); Steven H. Goldblatt, Esquire (on brief); Diana Young Morrissey (Third-Year Law Student) —For Appellate Litigation Clinical Program, Georgetown University Law Center.

Amici Curiae on behalf of Appellee:

Major Michael J. Hoover (argued); Colonel Kenneth R. Rengert (on brief)—For Appellate Government Division, USAF.

Commander Jay M. Siegel, JAGC, USNR (argued); Commander W.J. Hughes, JAGC, USN, Lieutenant Commander Michael R. McGuire, JAGC, USN (on brief)—For Appellate Government Division, USN.

John F. DePue, Esquire (argued); D. Lowell Jensen, Esquire, Assistant Attorney-General, Criminal Division (on brief)—For United States Department of Justice.

For Appellant: Anthony F. List, Esquire and Captain John Lukjanowicz (argued); Colonel William G. Eckhardt, Major Raymond C. Ruppert, Captain Joseph A. Russelburg, Captain William T. Wilson (on brief); Colonel Edward S. Adamkewicz, Jr.

For Appellee: Captain Michael E. Pfau and Captain Gary L. Hoffman (argued);

Opinion of the Court

EVERETT, Chief Judge:

This is a capital case—the first to reach our Court in many years.[1] Having re-

1. We wish to thank the parties and the amici

curiae for their thoughtful briefs and oral argu-

viewed the record pursuant to Article 67(b)(1), Uniform Code of Military Justice, 10 U.S.C. § 867(b)(1), we conclude that no prejudicial error was committed which affects the findings. However, under present circumstances, the death sentence cannot be imposed, but we authorize a rehearing where the death sentence may be imposed if certain conditions are met.

## I

### Statement of Facts

On March 2, 1979, charges were preferred against appellant for the premeditated murder and rape of Phyllis Jean Villanueva three days earlier at an American military installation in the Federal Republic of Germany, in violation of Articles 118 and 120, UCMJ, 10 U.S.C. §§ 918 and 920, respectively. On March 5, 1979, an investigation under Article 32, UCMJ, 10 U.S.C. § 832, was ordered, but it was delayed to permit appellant to undergo a psychiatric examination on March 29. No defense witnesses were called during the Article 32 investigation, because appellant's civilian counsel in Pennsylvania "requested that no witnesses for the defense be interviewed at" this time.[2] On May 10 the officer conducting this investigation submitted his report, in which he recommended trial by general court-martial.

In his pretrial advice, the staff judge advocate recommended that the convening authority refer the charges of premeditated murder and rape for trial as a capital case. However, he did not adopt the recommendation of the Article 32 investigating officer that additional charges be preferred against appellant for the maiming and robbery of his victim. The convening authority followed his staff judge advocate's advice.

On June 8, 1979, Matthews was arraigned at an Article 39(a), UCMJ, 10 U.S.C. § 839(a), session, and his trial began about two weeks later. His defense team, consisting of military counsel and his civilian lawyer, offered pleas of guilty "[t]o all charges and specifications." However, the military judge pointed out that, because "the accused may not in a capital case enter a plea of Guilty . . . the court must reject such a plea at this time." Upon defense counsel's request, the judge then allowed him to state for the record the reasons for entering the guilty pleas. Thereupon, appellant's civilian counsel made this statement:

> Your Honor, the Code of Military Justice provides an opportunity to all accused to enter a guilty plea to certain charges with the exception of capital charges as is the case here.

> My client feels that he has a constitutional right to plead Guilty to these charges, as he has a constitutional right to be tried if he so desires with respect to these charges.

> Therefore, Your Honor, at this time we are urging the court to accept my client's entry of a guilty plea to the two capital charges in question.

Despite these arguments, the military judge concluded that, in view of the prohibition in Article 45(b) of the Uniform Code, 10 U.S.C. § 845(b), he could not accept a plea of guilty to the capital offenses. Thereafter, appellant pleaded guilty to unpremeditated murder but not guilty to rape. In the ensuing providence inquiry, Matthews admitted that he had intentionally killed his victim by "repeatedly stabbing her with a pair of scissors." The judge found the plea of guilty to unpremeditated murder to be "provident" and accepted it.

Prior to proceeding with trial of the offenses charged, the military judge questioned the court members on *voir dire*. At the conclusion of this inquiry, trial counsel challenged two of the members for cause. When defense counsel opposed these challenges, the military judge denied them.

ments, which have helped us greatly in resolving the issues in this case.

**2.** Appellant's civilian counsel did not appear during the Article 32 investigation but consult-

ed with the military counsel. The same civilian attorney participated not only in the trial, but also in the argument of the case on appeal before this Court.

Similarly, he also denied three defense challenges for cause.

After both sides exercised a peremptory challenge, defense counsel stated that appellant was willing to waive his trial by court members and to proceed with trial by judge alone. He contended that the provision of the Uniform Code which denies this right in a capital case is unconstitutional. *See* Article 18, UCMJ, 10 U.S.C. § 818. The judge replied that, absent such a "specific" codal prohibition, he "would have no qualms at all about granting the request of the accused"; but since the Code contains such a prohibition, which he believed to be constitutional, "the request must be denied."

After trial counsel presented his opening statement, the defense moved for a mistrial because of allegedly "inflammatory and prejudicial remarks made" in that statement; but this motion also was denied. Thereupon, presentation of the Government's evidence commenced on June 26.

During the prosecution's case, Chief Warrant Officer Candelario Villanueva testified that, when his wife, an Army librarian, failed to return from work on the evening of February 27, 1979, he went to the library. There, he found her lying dead "in a puddle of blood" and "nude from the waist down." Over defense objection, the court received in evidence pictures of Mrs. Villanueva's dead body—pictures offered by "the Government to prove premeditation and rape." The pathologist who performed the autopsy testified that he found 53 stab wounds in the victim's body, of which six were "fatal wounds."

Another government witness, Specialist Larry B. Lawson, had been present at the library late on the afternoon of February 27, when Matthews said to Mrs. Villanueva, "I would like to take you out on a date." She replied, "I'm a happily married woman." Appellant was still there with her when Lawson left the library.

Specialist Joseph J. Turner—who testified under an immunity grant from the convening authority—had seen Matthews around 9:00 p.m. on the evening of February 27. Appellant "had blood on his hands" and "on the front of" his pants, and he stated that he thought "he done killed this bitch ... at the library." He also said he had had sexual intercourse with her. Matthews did not appear "intoxicated." In a few minutes, appellant had washed the blood from his hands and changed sweat suits.

Private Darrell D. Hughley—another witness testifying under a grant of immunity—also had seen Matthews on the evening of February 27. In a conversation about the "blood all over his hands and his arms," appellant told this witness, "I done killed this bitch." Matthews had also tried to burn blood off his sweat pants with a lighter. Hughley had seen appellant with a pair of scissors about 11 inches long. According to Hughley, appellant "was not intoxicated" on the evening of February 27, although he had been drinking earlier that day. However, Hughley testified that Matthews "was looking wild and strange."

Specialist Four James R. Bagwell—a third government witness testifying under a grant of immunity—hailed from the same hometown as Matthews and had known him before they arrived in Germany. On the evening of February 27, appellant described to him how he had raped the librarian and killed her with a pair of scissors. Bagwell walked with appellant to the library, where Matthews entered and retrieved "a six-pack of Pabst Blue Ribbon and a pair of scissors." Appellant told him that the victim "was a warrant officer's wife." Over defense objection, Bagwell was allowed to testify that in early February, Matthews had told him that "he would like to rape a German woman or a white woman" and also had discussed "ways of doing it, how to perform it." According to Bagwell, appellant acted "strange" and "like he was crazy" on the evening of February 27. "He was in shock." However, Matthews did not "appear intoxicated," did not "wander around in a lost daze," and "knew where he was at."

After two military investigators described some of the physical evidence at the

crime scene, Major Larry D. Reed, an Army psychiatrist who earlier had examined appellant, gave his opinion that, while Matthews "suffer[ed] from an explosive personality disorder," on February 27 he did not have any mental disease or defect which prevented him from knowing right from wrong or adhering to the right. According to this witness, appellant's "IQ of about 64 ... puts him in the mild mental retardation range."

The Government presented the testimony of several witnesses who had seen appellant at various times on February 27 and of a forensic chemist who had compared blood and hair samples taken from the deceased and from appellant. Thereafter, the Government rested its case.

Defense motions for findings of not guilty of premeditated murder and rape then were denied by the judge. In an Article 39(a) session, the judge considered another defense motion—one to dismiss the charges because of recruiter misconduct.[3] After a lengthy hearing, it, too, was denied.

Before presenting the defense evidence, appellant's civilian counsel made an opening statement in which he pointed out that Matthews did not deny his guilt of murder or rape and did not dispute his sanity. However, he contended that appellant had not premeditated or deliberated and that, "considering his mental condition[,] he was unable to form the necessary elements of premeditation and deliberation." According to counsel, "the case turns on whether or not the accused was able to premeditate, and in fact did premeditate, on February 27, 1979."

The defense then presented its first—and only—witness, Miss Shelby J. Harris, who in 1978 had been an Alcohol and Drug Counselor at Ford Hood, Texas. In that capacity, she had counseled Matthews about his alcoholism. According to this witness, appellant "would hold things in, and he would drink, and then he would just explode." After offering in evidence some of appellant's medical records from a hospital in his hometown, the defense rested.

The remainder of the trial proceeded expeditiously. There was no rebuttal evidence by the Government, although Miss Harris did return to the stand and testified further on request of a court member. Then, counsel presented their respective arguments, which focused on the issue of premeditation. In light of the defense argument, the judge decided to modify his proposed instructions to include advice as to the effect of voluntary intoxication on premeditation. Neither side desired additional instructions or objected to the proposed instructions.

After being instructed by the judge and after a brief recess, the members of the court retired to deliberate. An hour and a quarter later, the members announced their findings of guilty of all charges and specifications.

During the presentencing proceedings, the Government placed the accused's military records in evidence, and appellant's sister testified briefly in his behalf. No other evidence was offered by either side. After argument by counsel, the judge instructed the members on sentence, and, among other things, he explained that they "should consider evidence admitted as to the accused's age, education, background, training, service record, and family situation"; his "pretrial confinement since 1 March"; and the pleas of guilty he had entered. Furthermore, the judge advised that they "should consider the accused's condition classified as a character and behavior disorder as a mitigating factor tending to explain his conduct, either alone or in connection with his mental deficiency and other factors." There were no objections or requests for additional instructions.

The court closed for almost an hour, after which the members announced that, by unanimous vote on secret written ballot, they sentenced Matthews to death. The findings and sentence were approved by the convening authority. By divided vote, the United States Army Court of Military Review, sitting *en banc,* affirmed, except as to

---

3. The hearing on this motion had been delayed until some absent witnesses were available.

application of forfeitures.[4] The record then was transmitted to us for mandatory review pursuant to Article 67(b)(1).

## II

### Errors in General

Since this is a capital case for which our mandatory review is required, we have considered carefully not only errors assigned in our Court but also those urged at the Court of Military Review and at the trial level, as well as any possible error suggested by our own examination of the record. As we shall explain, we have found no prejudicial error.

### A. Speedy Trial.

■ We agree with the able trial judge that appellant's right to a speedy trial was not infringed. The period of delay from March 12th to March 30th was attributable to a defense request that no Article 32 hearing be conducted until after Matthews had received a psychiatric examination. *See United States v. Colon-Angueira*, 16 M.J. 20, 22 (C.M.A.1983). Deduction of these 18 days brings the period of pretrial confinement attributable to the Government below 90 days, and so no presumption of denial of a speedy trial operates against the Government. *See United States v. Burton*, 21 U.S.C.M.A. 112, 44 C.M.R. 166 (1971). We join fully in the military judge's conclusion that in view of the complexity of the case, the dispersion of witnesses, and other factors he cited, the Government did not delay unreasonably in moving to trial.

### B. Recruiter Misconduct.

■ With respect to appellant's motion to dismiss because of recruiter misconduct, the amendment of Article 2 of the Uniform Code—even though it took effect after the date of trial—is dispositive against him in view of the type of crime involved. *See*

*United States v. McDonagh*, 14 M.J. 415 (C.M.A.1983). Cf. *United States v. Marsh*, 15 M.J. 252 (C.M.A.1983).

### C. Unavailability of Witnesses at the Article 32.

■ Appellant complained that the grants of immunity to Turner, Hughley, and Bagwell, who later testified as government witnesses, had not been issued until a week or two before trial began. We concur with the trial judge's view that the unavailability of these witnesses to testify during the Article 32 investigation did not create a fatal defect in that investigation. Moreover, it was made clear that not only defense counsel, but also the prosecutor, had been unable to obtain information from these witnesses until immunity was granted them, and so the delay in gaining access to these witnesses impacted equally on the parties.

### D. Verbatim Record of the Article 32.

■ Appellant's civilian counsel had requested that a verbatim record be made of the testimony taken during the Article 32 investigation, and the officer conducting the investigation concurred with that request. Unfortunately, he could not obtain a reporter. However, the Uniform Code does not require that a verbatim record be made of testimony taken during an Article 32 investigation. Moreover, since tapes of the testimony were made available to defense counsel in lieu of a verbatim record, he was not required to rely solely on the summaries contained in the report of the investigation.

### E. Guilty Plea in a Capital Case.

■ Like the military judge, we are unaware of any constitutional right to plead guilty in capital cases. Furthermore, in light of the special treatment given to capital cases by courts and legislatures and

---

4. 13 M.J. 501 (A.C.M.R. *en banc* 1982). The United States Navy-Marine Corps Court of Military Review upheld as constitutional the death sentence adjudged by court-martial against an accused Marine, *United States v. Rojas*, 15 M.J.

902 (N.M.C.M.R.1983); but the United States Air Force Court of Military Review, sitting *en banc*, reached a different conclusion, *United States v. Gay*, 16 M.J. 586 (A.F.C.M.R.1983).

the irreversible effect of executing a capital sentence, we do not believe that Congress acted arbitrarily by providing in the Uniform Code that an accused cannot plead guilty to a capital charge. Furthermore, if the judge had allowed such a plea to premeditated murder, he would have been required by Article 45(a) to set it aside at a later time in the trial, because Matthews adduced evidence inconsistent with guilt of that offense. Even if the rape charge would not sustain a death sentence, we perceive no prejudice to appellant from the judge's refusal to accept a plea of guilty to this crime—especially since his counsel made it clear that appellant did not contest his guilt of rape and the judge advised the court members that Matthews had pleaded guilty to the extent permitted by law.

**F. Trial by Judge Alone in a Capital Case.**

 The Supreme Court has ruled that a defendant has no constitutional right to waive trial by jury. *See Singer v. United States,* 380 U.S. 24, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965). Therefore, we disagree with the defense contention that Matthews had a constitutional right to waive trial by the court members and that the Code's prohibition of such a waiver was unconstitutional. Once again, the unique nature of capital punishment provides adequate justification for the distinction which Congress has made in this regard.

**G. Photographs of Victim.**

 The defense objected to photographs of Mrs. Villanueva's disfigured, partly nude body. While these photographs are gory, appellant has no right to claim that, because of the gruesomeness of his crime, the trier of fact may not consider evidence as to how the crime was committed.

**H. Statement Regarding Intent to Rape.**

 With respect to Bagwell's testimony about appellant's comment to him earlier

in February—evidence to which the defense strongly objected—we do not believe that the trial judge abused his discretion by allowing receipt of this evidence. The remark by Matthews, a young black soldier, that "he would like to rape ... a white woman" was relevant to the rape charge, and it was, at least indirectly, related to the issue of premeditation. Cf. *United States v. Teeter,* 16 M.J. 68, 70–71 (C.M.A.1983).

**I. Challenges for Cause.**

 We also find no abuse of discretion in the judge's denial of the defense challenges for cause. The information which the challenged members had about the case was not of such a nature as to require that they be excused.

**J. Instructions on Findings.**

 The instructions on premeditation allowed Matthews everything to which he was entitled under our precedents. In instructing on reasonable doubt, the judge used a formula which we have subsequently disapproved. However, since there was no objection to this instruction and no request for clarification, this error was not prejudicial. *See United States v. Salley,* 9 M.J. 189 (C.M.A.1980). *See also, e.g., United States v. Kunak,* 5 U.S.C.M.A. 346, 17 C.M.R. 346 (1954).

**K. Effective Assistance of Counsel.**

 There have been suggestions that Matthews did not receive effective assistance of counsel, because in his opening statement and final argument civilian counsel readily conceded that Matthews was guilty of rape and was not insane. In view of appellant's earlier effort to plead guilty, the absence of any evidence that he lacked mental responsibility, and the overwhelming evidence offered against Matthews by the Government,[5] the tactics of appellant's counsel are readily understandable. He did not want to appear unreasonable to the

---

5. We perceive no reason to set out all the lurid details of the crimes for which Matthews was convicted. However, the evidence left no

doubt that he had killed and raped Mrs. Villanueva in a particularly brutal manner.

court members by disputing matters which were obvious from all the evidence. *Cf. United States v. Volmar,* 15 M.J. 339 (C.M. A.1983).

### L. Attempt to Plead Guilty.

▮▮▮▮ We are puzzled by defense counsel's initial attempt to enter a plea of guilty to all the charges in light of the vigorous effort exerted later in the trial to disprove the existence of premeditation. However, since the guilty plea was entered outside the hearing of any court members and was rejected by the judge, we can perceive no prejudice to Matthews from this action by his counsel; and this action does not establish ineffective assistance of counsel. Because the military judge was not the trier of fact—and, under the Code, could not be in this case—we disagree with appellant's contention that the judge should have withdrawn from the case at that point. Moreover, we note that appellant and his counsel did not manifest any concern at trial that it was inappropriate for the judge to continue to sit in the case; and no challenge for cause was entered against him at any time during the trial.

Having found no prejudicial error in the prefindings stages of the trial, we now turn to the matter of whether any error as to sentencing occurred.

### III

### *Power of this Court to Rule on Constitutional Issues*

Relying on constitutional guarantees of due process and equal protection and on the prohibition against cruel and unusual punishment, *see* U.S. Const. amends. V and VIII, appellant and several of the *amici curiae* have attacked the constitutionality of the capital punishment provisions of Articles 118 and 120 of the Uniform Code of Military Justice. In resisting this attack, appellate government counsel offer an initial objection that, since our Court is established under Article I, rather than Article III, of the United States Constitution, we

lack authority to rule that provisions of the Code are invalid on constitutional grounds.

Their contention may be subdivided into two propositions. The first is that Congress cannot confer upon an Article I court the power to adjudicate the constitutionality of a provision of the Code—or presumably of any other Federal statute. The second proposition is that, even if Congress could have granted our Court such authority, it never did so.

As to the absence of legislative power, appellate government counsel have cited "the principle" mentioned in *Johnson v. Robison,* 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974), "that '[a]djudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies.'" *Id.* at 368, 94 S.Ct. at 1166. However, this Court is not an administrative agency. As the United States Court of Appeals for the District of Columbia Circuit observed in refusing to review one of our decisions:

> The Court of Military Appeals, with the entire hierarchy of tribunals which it heads, may perhaps be considered as being within the military establishment; perhaps, whether or not that is so, it is properly to be viewed as a specialized legislative court, comparable to the United States Court of Customs and Patent Appeals. But, in any view, the Court of Military Appeals appears to us to be a court in every significant respect, rather than an administrative agency. Certainly Congress intended that in its dignity and in its standards of administering justice the Court of Military Appeals should be assimilated to and equated with the established courts of the Federal sytem.

*Shaw v. United States,* 209 F.2d 811, 813 (D.C.Cir.1954) (footnotes omitted).

Appellate government counsel have also contended that even a court established under Article I, rather than Article III, of the Constitution may not decide the constitutionality of congressional enactments. *Cf.* Redish, *Legislative Courts, Administrative Agencies, and the Northern Pipeline Deci-*

*sion,* 1983 Duke L.J. 197, 224–26. However, as the plurality opinion noted in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* —— U.S. ——, 102 S.Ct. 2858, 2867 n. 14, 73 L.Ed.2d 598 (1982):

At one time, this Court suggested a rigid distinction between those subjects that could be considered only in Art. III courts and those that could be considered only in legislative courts. *See Williams v. United States,* 289 U.S. 553, 53 S.Ct. 751, 77 L.Ed. 1372 (1933). But this suggested dichotomy has not withstood analysis. *See* Wright, *Law of the Federal Courts* 33–35 (3d ed. 1976). Our more recent cases clearly recognize that legislative courts may be granted jurisdiction over some cases and controversies to which the Art. III judicial power might also be extended. *E.g., Palmore v. United States,* 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973). *See Glidden v. Zdanok,* 370 U.S. 530, 549–551, 82 S.Ct. 1459, 1472–1473, 8 L.Ed.2d 671 (1962) (Opinion of Harlan, J.).

In *Palmore v. United States,* 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973), a defendant appealed his felony conviction in the Superior Court of the District of Columbia, since he had not been tried by a judge who had protection with respect to tenure and salary under Article III of the Constitution. Rejecting this claim, the Supreme Court held "that under its Art. I, § 8, cl. 17, power to legislate for the District of Columbia, Congress may provide for trying local criminal cases before judges who, in accordance with the District of Columbia Code, are not accorded life tenure and protection against reduction in salary." *Id.* at 390, 93 S.Ct. at 1672. The opinion of the Court observes that Congress "was not constitutionally required to create inferior Art. III courts to hear and decide cases within the judicial power of the United States, including those criminal cases arising under the laws of the United States." *Id.* at 401, 93 S.Ct. at 1678.

In demonstrating that it had been "neither the legislative nor judicial view ... that trial and decision of all federal questions were reserved for Art. III judges," the Court noted that, "[v]ery early in our history, Congress left the enforcement of selected federal criminal laws to state courts and to state court judges who did not enjoy the protections prescribed for federal judges in Art. III." Indeed, the state courts could even be required by Congress to enforce federal penal laws. *Id.* at 402, 93 S.Ct. at 1678. Furthermore, territorial courts established by Congress under powers granted it by Article IV of the Constitution "have not been deemed subject to the strictures of Art. III, even though they characteristically enforced not only the civil and criminal laws of Congress applicable throughout the United States, but also the laws applicable only within the boundaries of the particular territory." *Id.* at 403, 93 S.Ct. at 1679.

As still another justification for its position, the *Palmore* majority referred to courts-martial and commented:

There is another context in which criminal cases arising under federal statutes are tried, and defendants convicted, in non-Art III courts. Under its Art I, § 8, cl 14, power "[t]o make Rules for the Government and Regulation of the land and naval Forces," Congress has declared certain behavior by members of the Armed Forces to be criminal and provided for the trial of such cases by court-martial proceedings in the military mode, not by courts ordained and established under Art. III. Within their proper sphere, courts-martial are constitutional instruments to carry out congressional and executive will. *Dynes v. Hoover,* 20 How. 65, 79, 82, 15 L.Ed. 838 (1857). The "exigencies of military discipline require the existence of a special system of military courts in which not all of the specific procedural protections deemed essential in Art. III trials need apply," *O'Callahan v. Parker,* 395 U.S. 258, 261 [89 S.Ct. 1683, 1685, 23 L.Ed.2d 291] (1969); and "the Constitution does not provide life tenure for those performing judicial functions in military trials," *U.S. ex rel. Toth v.*

*Quarles,* 350 U.S. 11, 17, 76 S.Ct. 1, 5, 100 L.Ed. 8 (1955). *Id.* at 404, 93 S.Ct. at 1679.

■ We recognize, of course, that in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co., supra,* the Supreme Court ruled that certain matters could not be handled by bankruptcy judges because they lacked Article III protections with respect to tenure and salary. However, we do not believe that the Court intended to prevent Article I judges from considering any constitutional issues that might arise in cases within their jurisdiction, even if those issues involved the constitutionality of a federal statute. Indeed, we perceive nothing in the language concerning "[t]he judicial Power" in Article III, section 2, of the Constitution which would support any such constitutional limitation on the questions to be considered by Article I judges.

■ *Palmore v. United States, supra,* emphasizes that "the Constitution does not provide life tenure for those performing judicial functions in military trials." *Id.* at 404, 93 S.Ct. at 1679, quoting *Toth v. Quarles, supra* 350 U.S. at 17, 76 S.Ct. at 5. We interpret this language to mean that Congress is free to provide that the "judicial functions" in administering military justice need not be performed by Article III judges. Certainly, there is no suggestion in *Palmore* that, under the Constitution, the "judicial functions in military trials" cannot include consideration of the constitutionality of pertinent federal legislation.

We observe that other Article I courts have not felt inhibited in considering the constitutionality of federal statutes. For example, in *United States v. Edwards,* 430 A.2d 1321 (D.C.Ct.App.1981), *cert. denied,* 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 141 (1982), the District of Columbia Court of Appeals, sitting *en banc,* discussed extensively the constitutionality of pretrial detention provisions of the District of Columbia Code; but none of the judges even

intimated that, because they held office under Article I, they were precluded from considering the constitutional issue. Prior to the Supreme Court's decision in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co., supra,* several bankruptcy judges had considered the constitutionality of certain jurisdictional provisions of the Bankruptcy Act of 1978.[6] In the recent cases concerning the constitutionality of death sentences adjudged by courts-martial, *see* n. 4, *supra,* none of the judges of the Courts of Military Review seem to have been concerned that, since they hold office pursuant to Article I, they might lack power to determine the constitutionality of relevant provisions of the Uniform Code.

■ According to the view of appellate government counsel, Congress is empowered by Article I, section 8, clause 14, to establish Courts of Military Review and a Court of Military Appeals, with judges who are sworn to uphold the Constitution; yet they argue that Congress cannot authorize those judges to refuse to enforce statutes which they determine are unconstitutional. In light of precedent and practice, we are convinced that the draftsmen of the Constitution never intended such an anomalous result.

■ Likewise, we are sure that Congress intended for this Court to have unfettered power to decide constitutional issues—even those concerning the validity of the Uniform Code. To impute a contrary intent would itself raise the constitutional question whether a judge—even one appointed under Article I, rather than under Article III—could be required by oath to support the Constitution of the United States, *see* U.S. Const. art. VI, but at the same time be forced to make decisions and render judgments based on statutes which he concluded were contrary to that Constitution.

---

**6.** *See Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* —— U.S. ——, 102 S.Ct. 2858, 2864 n. 9, 73 L.Ed.2d 598 (1982). None of the opinions filed in the Supreme

Court in that case, suggests that, because those judges received their power under Article I, they were precluded from considering the constitutionality of the Act.

Furthermore, every indication of legislative intent supports the conclusion that Congress meant for this Court to have the power to determine the constitutionality of the Code and of any other statute directly involved in a case pending before us. For one thing, in many respects this Court has been treated by Congress like the Article III courts. Each judge of our Court receives "the same salary ... provided for judges of the United States Court of Appeals." Article 67(a)(1), UCMJ, 10 U.S.C. § 867(a)(1). "If a judge of the ... Court ... is temporarily unable to perform his duties because of illness or other disability, the President may designate a judge of the United States Court of Appeals for the District of Columbia"—which is an Article III court—"to fill the office for the period of disability." [7] Article 67(a)(3). Under the Ethics in Government Act, our financial disclosure statements are filed with the Judicial Ethics Committee, along with those of Article III Federal judges. 28 U.S.C. App. §§ 303(b) and 308(9). The Court has been empowered to issue orders granting testimonial immunity, 18 U.S.C. §§ 6001(4), 6002, and under the All Writs Act, 28 U.S.C. § 1651(a), we may issue extraordinary writs in appropriate circumstances. *See Noyd v. Bond,* 395 U.S. 683, 695 n. 7, 89 S.Ct. 1876, 1883 n. 7, 23 L.Ed.2d 631 (1969).

In every respect, Congress has sought to assure our judicial independence. *Cf. Mundy v. Weinberger,* 554 F.Supp. 811 (D.D.C. 1982). Indeed, upon rejecting the title "Judicial Council" because it suggested "one of the usual basement operations here in Washington" and sounded "too much like a city council," the drafters of the Uniform Code considered using the title "Supreme Court of Military Appeals" before adopting a proposal by the Judge Advocate General of the Navy to designate our Court, "The Court of Military Appeals." Hearings on H.R. 2498 Before a Subcommittee of the House Armed Services Committee, 81st

Cong., 1st Sess., reprinted in *Index and Legislative History, Uniform Code of Military Justice,* 1276–78 (1949).[8] As we have commented on several occasions, Congress made us responsible for "the protection and preservation of the Constitutional rights of persons in the armed forces," *United States v. Frischholz,* 16 U.S.C.M.A. 150, 152, 36 C.M.R. 306, 308 (1966), and "confer[red] upon" us "a general supervisory power over the administration of military justice." *Gale v. United States,* 17 U.S.C.M.A. 40, 42, 37 C.M.R. 304, 306 (1967). Having entrusted us with such responsibilities, Congress could hardly have intended to deny us the important power to determine the constitutionality of Federal statutes applicable to cases we review.

There is an additional disadvantage in the view advanced by appellate government counsel. Because of their promulgation under authority delegated by Congress, many provisions of the Manual for Courts-Martial—and probably many military regulations, as well—have the force of law. *Paul v. United States,* 371 U.S. 245, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963); *Standard Oil Company v. Johnson,* 316 U.S. 481, 62 S.Ct. 1168, 86 L.Ed. 1611 (1942). The Government's position would suggest that these directives, too, would be immunized from constitutional scrutiny by this Court. We are confident that Congress never intended for such a gap to exist in the protection it provided servicemembers through review of their cases in this Court.

To accept the position of appellate government counsel would lead to other results which Congress obviously does not desire. For example, the doctrine of exhaustion of remedies by an accused servicemember would be significantly curtailed. Currently, a servicemember must exhaust his remedies within the military system before seeking relief in an Article III court.

7. It would be strange if an Article III judge sitting on this Court under these circumstances did not have the power to determine the constitutionality of the statute—a power which he would have if serving on his own court.

8. In 1968, Congress gave this Court its present title, "United States Court of Military Appeals." Act of June 15, 1968, Pub.L. No. 90–340, 82 Stat. 179.

*See, e.g., Schlesinger v. Councilman,* 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975); *Noyd v. Bond, supra.* This requirement assumes that military remedies are available; but if appellate government counsel were correct, a servicemember would have no remedy within the military system of justice when he claimed that his rights had been violated by an unconstitutional statute. Thus, for such claims there would be no grounds to delay collateral attack in an Article III court.

Furthermore, piecemeal litigation and duplication of effort would result if appellate government counsel were correct. Even in that event, this Court would remain free to construe statutes; and in that connection we often would have occasion to deal with constitutional issues, since a statute should be interpreted in a manner that will avoid constitutional defects. *Cf. United States v. Jacoby,* 11 U.S.C.M.A. 428, 29 C.M.R. 244 (1960). However, we would not be allowed to consider directly whether a statute was unconstitutional; and this issue would have to be presented in some way to an Article III court.[9]

■ Finally, we note that recently, at the urging of the Department of Defense, the Senate passed S. 974, which authorizes the Supreme Court to review some of our decisions upon petition for certiorari by the accused or by the Government. One of the reasons advanced for this change is to provide the Government a remedy when, on constitutional grounds, our Court renders a decision adverse to its position. According to both the testimony of the General Counsel of the Department of Defense, and to the Senate Report accompanying S. 974, S.Rep. 98–53, 98th Cong., 1st Sess., pp. 6, 8 (1983), the Government currently has no remedy in such a case. This argument assumes that the Government cannot obtain relief *from* Congress because our Court is authorized to apply the Constitution even in the face of a conflicting statute. Thus,

both the Department of Defense and the Senate appear to have rejected the premise now relied on by appellate government counsel. We join in that rejection.

## IV

### A

### *Applicability of Civilian Precedent to Military Cases*

■ The most successful constitutional attacks on capital punishment have invoked the Eighth Amendment, which prohibits "cruel and unusual punishments." Article 55 of the Uniform Code, 10 U.S.C. § 855, provides a servicemember comparable protection against "[p]unishment by flogging, or by branding, marking, or tattooing on the body, or any other cruel or unusual punishment." Indeed, we have held that, in enacting Article 55, Congress "intended to grant protection covering even wider limits" than "that afforded by the Eighth Amendment." *United States v. Wappler,* 2 U.S.C.M.A. 393, 396, 9 C.M.R. 23, 26 (1953).

Since a servicemember is entitled both by statute and under the Eighth Amendment to protection against "cruel and unusual punishments," we shall seek guidance from Supreme Court precedent as to the significance of this protection in capital cases. However, we recognize that, since in many ways the military community is unique, *Schlesinger v. Councilman, supra; Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), there may be circumstances under which the rules governing capital punishment of servicemembers will differ from those applicable to civilians. This possibility is especially great with respect to offenses committed under combat conditions when maintenance of discipline may require swift, severe punishment, or in violation of the law of war, e.g., spying. *Cf. United States v. Gay,* 16 M.J. 586, 605–06 (A.F.C.M. R.1982) (Hodgson, C.J., concurring).

---

9. To divide the process of judicial review in this matter is contrary to congressional efforts to simplify trials and appeals. For example, the Bankruptcy Act of 1978 attempted—*albeit* un-

successfully—to concentrate in a single court, the bankruptcy court, adjudication of all issues concerning a bankrupt's estate.

However, the murder and rape committed by Matthews have no characteristics which, for purposes of applying the prohibition against "cruel and unusual punishments," distinguish them from similar crimes tried regularly in State and Federal courts. Although appellant's offenses were service-connected and subject to trial by court-martial, we see no reason why Matthews should be executed for his murder and rape of Mrs. Villanueva if the sentencing procedures used by the court-martial failed to meet the standards established by the Supreme Court for sentencing in capital cases in civilian courts. There is no military necessity for such a distinction; and we do not believe that applying lower standards in this case would conform to the intent of Article 55 or of the Eighth Amendment.

### B

#### Supreme Court Precedents Examined

In 1972, the Supreme Court reversed 200 years of precedent—as well as its own decision in *McGautha v. California,* 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971)—by holding that existing state capital punishment statutes violated the Eighth Amendment because they permitted exercise of uncontrolled discretion by sentencing authorities in determining whether to impose capital punishment in any specific case. In *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), Georgia and Texas statutes were held unconstitutional insofar as they pertained to the imposition of the death penalty. Although the opinions of the various Justices were scattered like a covey of quail, there clearly was agreement that uncontrolled sentencing discretion was not constitutionally permitted. Justice Douglas believed:

The high service rendered by the "cruel and unusual" punishment clause of the Eighth Amendment is to require legislatures to write penal laws that are even-handed, nonselective, and nonarbitrary, and to require judges to see to it that general laws are not applied sparsely, se-lectively, and spottily to unpopular groups.

*Id.* at 256, 92 S.Ct. at 2735. Justice Stewart held that the statutes did not reflect "a legislative determination that forcible rape and murder can be deterred only by imposing the penalty of death," *id.* at 309, 92 S.Ct. at 2762, so he

conclude[d] that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed.

*Id.* at 310, 92 S.Ct. at 2762. Justice White found the death penalty to be so seldom imposed that it was no longer an effective deterrent to crime and made only marginal contributions to any discernible social or public purpose. Justices Marshall and Brennan concluded that capital punishment was, in terms of the thinking of today's world, "a cruel and unusual punishment," *id.* at 314, 257, 92 S.Ct. at 2765, 2736, and therefore violated the Eighth Amendment in any case. The Chief Justice, dissenting, was joined by Justices Blackmun, Powell, and Rehnquist on the ground that the Eighth Amendment prohibited only "cruel and unusual punishments," and since the death penalty was well known to the drafters of the amendment, it was not intended to be included within those terms. He summarized the thrust of the Court's holding in terms of the concurring opinions of Justices Stewart and White to the effect that,

if the legislatures are to continue to authorize capital punishment for some crimes, juries and judges can no longer be permitted to make the sentencing determination in the same manner they have in the past.

*Id.* at 397, 92 S.Ct. at 2807 (footnote omitted). In their own separate dissenting opinions, other Justices in differing ways opined that the death penalty provisions of the Uniform Code were possibly imperiled by the majority decisions, 408 U.S. at 412, 92 S.Ct. at 2815 (Blackmun, J.); "are voided," at 417–18, 92 S.Ct. at 2817–18 (Powell, J.).

While the nature of the diverse opinions makes brief summary impossible, *Furman v. Georgia, supra,* appears to stand for these propositions:

1. A Majority of the Court Believed That Capital Punishment Was Not Unconstitutional *Per Se,* But the Sentencing Procedures Under Which It May Be Imposed Must Be Far More Detailed and Specific To Allow a Rational Understanding As To the Standards Utilized By the Sentencing Authority In Arriving At the Decision To Impose the Death Penalty In Any Particular Case.

2. At Least Two Of the Justices Believed That Capital Punishment Is Barred In All Cases.

In response to *Furman,* many states reenacted capital punishment statutes, intending to comply with what they understood the Supreme Court's opinion to mean. In 1976, five of these new statutes came before the Supreme Court for consideration.

In *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the new Georgia statute was examined. Georgia had "retain[ed] the death penalty for six categories of crime." *Id.* at 162, 96 S.Ct. at 2920. Under its new procedure, an accused convicted of one of these crimes then entered a separate ("bifurcated," *id.* at 163, 96 S.Ct. at 2920) sentencing trial where "evidence in mitigation, extenuation, and aggravation of" the crime was presented. Ga. Code Ann. § 27–2503 (Supp.1975), quoted, 428 U.S. at 163, 96 S.Ct. at 2920. When instructing the jury on the sentencing procedures, the judge informed them about "any mitigating . . . or aggravating circumstances otherwise authorized by law and [about] any of [10] statutory aggravating circumstances," enumerated by the statute "which may be supported by the evidence" in the case, § 27–2534.1(*b*), including evidence introduced before findings. Except for two specified crimes, the jury was required to "find beyond a reasonable doubt" the presence of at least "one of the 10 [statutory] aggravating circumstances" (428 U.S. at 164, 96 S.Ct. at 2921), and, if death was to be imposed, to specify that circum-

stance. In jury cases, the judge was bound by the jury's decision on sentence. After conclusion of jury deliberations, the trial judge was required to submit a report "designed to" review the trial in several ways in order "to test for arbitrariness and disproportionality of sentence." *Id.* at 167, 96 S.Ct. at 2922. After this, the statute provided "for special expedited direct review by the" state supreme court, *id.* at 166, 96 S.Ct. at 2922, which likewise had to make findings as to "[w]hether the sentence . . . was imposed" in any prejudicial or "arbitrary" manner, *id.* at 166–67, 96 S.Ct. at 2922; "[w]hether . . . the evidence support[ed] the . . . finding of a statutory aggravating circumstance"; and "[w]hether . . . considering both the crime and the "accused, "the sentence . . . [was] excessive or disproportionate to the penalty imposed in similar cases." *Id.* at 167, 96 S.Ct. at 2922. The Supreme Court approved this procedure because it

> focus[ed] the jury's attention on the particularized nature of the crime and the particularized characteristics of the individual defendant. While the jury is permitted to consider any aggravating or mitigating circumstances, it must find and identify at least one statutory aggravating factor before it may impose a penalty of death. In this way the jury's discretion is channeled. No longer can a jury wantonly and freakishly impose the death sentence; it is always circumscribed by the legislative guidelines. In addition, the review function of the Supreme Court of Georgia affords additional assurance that the concerns that prompted our decision in *Furman* are not present to any significant degree in the Georgia procedure applied here.

*Id.* at 206–07, 96 S.Ct. at 2940–41. (opinion of Justices Stewart, Powell, and Stevens, announcing the judgment).

The new Florida statute, considered in *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), was "patterned in large part on the Model Penal Code." Like the Georgia statute, it mandated a bifurcated proceeding and set out a number

of statutory "aggravating ... circumstances." However, the statute also listed seven mitigating circumstances, *id.* at 248, 96 S.Ct. at 2965, the jury was required to determine whether these circumstances were present in a given case and, if so, to weigh them against the aggravating circumstances. The actual sentencing was to be done by the judge, who was required to "set forth in writing" and in terms of the statutory criteria the "findings upon which [he imposed] the sentence of death." *Id.* at 250, 96 S.Ct. at 2965. Review by the state supreme court was automatic, although no specific form was prescribed. According to the Supreme Court of Florida, its "[r]eview ... guarantees that the reasons present in one case will reach a similar result to that reached under similar circumstances in" other cases. *State v. Dixon,* 283 So.2d 1, 10 (1973). In approving this statutory design, Justice Stewart explained "that judicial sentencing" might well "lead ... to even greater consistency in the imposition" of capital punishment, because a judge could be expected to be "more experienced in sentencing [matters] than a jury." *Id.* 428 U.S. at 252, 96 S.Ct. at 2966 (opinion of Justices Stewart, Powell, and Stevens, announcing the judgment).

The third statute to receive Supreme Court approval was that of Texas in *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). The Texas statute significantly differed from those of both Georgia and Florida. It limited capital punishment "to intentional and knowing murders committed in five [specific] situations." *Id.* at 268, 96 S.Ct. at 2954. In a bifurcated trial, the jury, after having found the defendant guilty, met again to determine whether to impose capital punishment. At that time, two "statutory questions" (and a third when applicable) were posed to the jury, *id.* at 267, 269, 96 S.Ct. at 2954, 2955, which had to be answered affirmatively and unanimously, based upon evidence found by them beyond a reasonable doubt. An "expedited" appeal to the Texas Court of Criminal Appeals followed. *Id.* at 269, 96 S.Ct. at 2955.

In reviewing this procedure, Justice Stewart, in an opinion joined by Justices Powell and Stevens, announcing the judgment, noted that, although "Texas ha[d] not adopted" any "statutory aggravating circumstances" justifying "imposition of the death penalty," it had "narrow[ed] the categories of murders for which a death penalty" could "be imposed." This action, it opined, "serv[ed] ... the same purpose .... Each requires the sentencing authority to focus on the particularized nature of the crime." *Id.* at 270–71, 96 S.Ct. at 2955–56. However, the Court commented that the "jury must be allowed to consider ... all relevant evidence" as to "why a death sentence should be imposed," including all the mitigating circumstances which could be presented by the defense. Because the Texas statute did "not explicitly speak of mitigating circumstances, ... the constitutionality of the Texas procedures turns on whether the enumerated questions allow consideration of particularized mitigating factors." *Id.* at 272, 96 S.Ct. at 2956.

In this regard the court below indicated in this case that it "interprete[d] ... [the] second question so as to allow ... [the] defendant to" inform the jury of "mitigating circumstances." *Id.* at 272, 96 S.Ct. at 2956. That court explained:

"In determining the likelihood that the defendant would be a continuing threat to society, the jury could consider whether the defendant had a significant criminal record. It could consider the range and severity of his prior criminal conduct. It could further look to the age of the defendant and whether or not at the time of the commission of the offense he was acting under duress or under the domination of another. It could also consider whether the defendant was under an extreme form of mental or emotional pressure, something less, perhaps, than insanity, but more than the emotions of the average man, however inflamed, could withstand."

*Id.* at 272–73, 96 S.Ct. at 2956–97, *quoting from* 522 S.W.2d 934, 939–40 (1975). Thus, the Supreme Court concluded that the Texas law permitted the defendant to introduce

mitigating evidence for the jury's use in deciding whether to impose the death penalty. Hence, the Texas statute was consistent with those of Georgia and Florida in providing the sentencing authority in capital cases with guidance which "focuse[d] ... objective consideration on the particularized circumstances of the individual offense and the individual offender before" imposing a death penalty. *Id.* at 274, 96 S.Ct. at 2957.

The Court considered these aspects of Texas procedure significant:

> By narrowing its definition of capital murder, Texas has essentially said that there must be at least one statutory aggravating circumstance in a first-degree murder case before a death sentence may even be considered. By authorizing the defense to bring before the jury at the separate sentencing hearing whatever mitigating circumstances relating to the individual defendant can be adduced, Texas has ensured that the sentencing jury will have adequate guidance to enable it to perform its sentencing function. By providing prompt judicial review of the jury's decision in a court with statewide jurisdiction, Texas has provided a means to promote the evenhanded, rational, and consistent imposition of death sentences under law. Because this system serves to assure that sentences of death will not be "wantonly" or "freakishly" imposed, it does not violate the Constitution.

*Id.* at 276, 96 S.Ct. at 2958.

At the same time, the Court disapproved two statutory schemes which removed "unbridled jury discretion" (428 U.S. 280, 302, 96 S.Ct. 2978, 2990, 49 L.Ed.2d 944) by making the death penalty mandatory upon a jury finding of guilty of certain offenses. In *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), Justice Stewart, announcing the judgment in an opinion joined by Justices Powell and Stevens, traced the history of mandatory sentencing and concluded that the concept had been rejected by the judicial practice in recent times. Further, it found that a mandatory death statute did "not fulfill *Furman*'s basic requirement by replacing arbitrary and wanton jury discretion with objective standards to guide, regularize, and make rationally reviewable the process for imposing a sentence of death." In addition, it failed "to allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition ... of a sentence of death." *Id.* at 303, 96 S.Ct. at 2990. This defect was important because:

> A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind.

*Id.* at 304, 96 S.Ct. at 2991.

The Louisiana statute—although differing from the North Carolina provision by requiring the judge to instruct the jury as to all lesser degrees of murder, whether raised by the evidence or not—similarly made death a mandatory punishment for five categories of murder. The jury was required to determine only if two conditions existed at the time of the killing. If these conditions were met, the sentence to death was mandatory; if they were not, some lesser offense could be found and a lighter punishment imposed.

This statute, too, failed to pass constitutional scrutiny because:

> The constitutional vice of mandatory death sentence statutes—lack of focus on the circumstances of the particular offense and the character and propensities of the offender—is not resolved by Louisiana's limitation of first-degree murder to various categories of killings.

*Roberts v. Louisiana,* 428 U.S. 325, 333, 96 S.Ct. 3001, 3006, 49 L.Ed.2d 974 (1976) (opinion by Justice Stewart, joined by Justices Powell and Stevens, announcing the judgment).

Since the publication of these five decisions, the Supreme Court has rendered

many other decisions defining and redefining them. In *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the defendant was charged with murder as an aider and abetter under an indictment which alleged these aggravating circumstances:

(1) [T]hat the murder was "committed for the purpose of escaping detection, apprehension, trial, or punishment" for aggravated robbery, and (2) that the murder was "committed while ... committing, attempting to commit, or fleeing immediately after committing or attempting to commit ... aggravated robbery."

*Id.* at 589, 98 S.Ct. at 2957. Because her conviction did not negate these circumstances,

The Ohio ... statute required the trial judge to impose a death sentence unless, after "considering the nature and circumstances of the offense" and ... [the defendant's] "history, character, and condition," he found by a preponderance of the evidence that (1) the victim had induced or facilitated the offense, (2) it was unlikely that Lockett would have committed the offense but for the fact that she "was under duress, coercion, or strong provocation," or (3) the offense was "primarily the product of [Lockett's] psychosis or mental deficiency."

*Id.* at 593–94, 98 S.Ct. at 2958–59. "After considering the [presentence report and psychiatric and psychological] reports and hearing argument on the" sentence, "the trial judge concluded that the offense" was "not primarily the product of psychosis or mental deficiency," and "[w]ithout specifically addressing the other two statutory mitigating factors," he concluded "that he had 'no alternative' but to impose the death penalty." *Id.* at 594, 98 S.Ct. at 2959.

The Supreme Court found the Ohio statute to be constitutionally infirm since it "did not permit the sentencing judge to consider, as mitigating factors, her character, prior record, age, lack of specific intent to cause death, and her relatively minor part in the crime." *Id.* at 597, 98 S.Ct. at

2961. Chief Justice Burger's plurality opinion

conclude[d] that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

*Id.* at 604, 98 S.Ct. at 2964 (footnotes omitted).

In a similar vein is *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), where the defendant, although sixteen years old, was tried as an adult for killing a state patrolman. He was convicted of first degree murder on his plea of *nolo contendere.* The Oklahoma statute provided that, under those circumstances, the trial court must "conduct a separate sentencing proceeding to determine whether ... death or life imprisonment" should be adjudged. Okl.Stat., Tit. 21, § 701.10 (1980), quoted, 455 U.S. at 106, 102 S.Ct. at 872. It also listed "seven separate aggravating circumstances" and permitted presentation of "evidence ... as to 'any mitigating circumstances or as to any of the aggravating circumstances.'" *Id.* at 106, 102 S.Ct. at 872, quoting § 701.10. The statute did not define the statutory term, "any mitigating circumstances." The prosecution alleged the occurrence of three of the statutory "aggravating circumstances," *id.* at 106, 102 S.Ct. at 872, and, in response, Eddings presented "evidence ... of his troubled youth." *Id.* at 107, 102 S.Ct. at 872. The "judge weighed the evidence" from both sides and concluded "that the State had proved each of the ... alleged aggravating circumstances beyond a reasonable doubt," *id.* at 108, 102 S.Ct. at 873, but, except for the fact of Eddings' youth, he found the law prevented him from "'consider[ing] the fact of this young man's violent background.'" *Id.* at 109, 102 S.Ct. at 873. The Oklahoma Court of Criminal Appeals affirmed the death sentence, holding that while Eddings' "family history ... [was]

useful in explaining why he behaved the way he did, ... it ... [did] not excuse his behavior." *Id.* at 110, 102 S.Ct. at 874.

The Supreme Court viewed the Oklahoma court's holding to mean that the courts there would only consider "evidence to be mitigating which would tend to support a legal excuse from criminal liability." This "violated the rule in" (*id.* at 113, 102 S.Ct. at 875) *Lockett v. Ohio, supra:*

> Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law,* any relevant mitigating evidence.

*Id.* at 113–14, 102 S.Ct. at 875–76. Justice O'Connor concurred in a separate opinion, to ensure that any *"mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense" which the defense chooses to offer must be considered in determining whether or not to impose capital punishment. *Id.* at 118, 102 S.Ct. at 878.

During the most recent term, the Supreme Court published three more opinions which bear on the issues before us. In *Zant v. Stephens,* —— U.S. ——, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), the jury had found three of the aggravating circumstances prescribed by the Georgia statute as the basis for imposing the death penalty. While Stephens' appeal was pending, the Georgia Supreme Court held that one of the aggravating circumstances found in his case was unconstitutionally vague. However, it later upheld his sentence on the basis of the other two circumstances specified by the jury.

Stephens appealed on the ground that invalidation of one of the aggravating circumstances required that the jury's decision be set aside. Citing *Stromberg v. California,* 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931), he argued that it could not be determined whether the jury had given weight to the invalid circumstance. The Supreme Court held that, because the Georgia statute—as interpreted by that state's supreme court—did not require the jury "to balance [any] aggravating [circumstance] against

[any] mitigating circumstances" or "to give any special weight to any aggravating circumstance," the jury's finding that two valid aggravating circumstances were established by the evidence beyond a reasonable doubt sufficed to allow imposition of the death penalty.

> Thus, in Georgia, the finding of an aggravating circumstance does not play any role in guiding the sentencing body in the exercise of its discretion, apart from its function of narrowing the class of persons convicted of murder who are eligible for the death penalty.

*Id.* 103 S.Ct. at 2741.

Explaining that *Gregg v. Georgia* had "set forth a general exposition of sentencing procedures that would satisfy the concerns of *Furman,*" the Court also noted that the plurality opinion in *Gregg* did

> "not intend to suggest that only the above-described procedures would be permissible under *Furman* or that any sentencing system constructed along these general lines would inevitably satisfy the concerns of *Furman,* for each distinct system must be examined on an individual basis."

*Id.* at 2741, quoting *Gregg v. Georgia, supra* 428 U.S. at 195, 96 S.Ct. at 2935. The Court observed that "Georgia has a bifurcated [sentencing] procedure" and a "meaningful appellate review of every death sentence." *Id.* 103 S.Ct. at 2741. Unlike "the Model Penal Code's recommendation that the jury's discretion in weighing aggravating and mitigating circumstances against each other should be governed by specific standards," Georgia instead has a procedure where the finding of "the aggravating circumstance merely performs the function of narrowing the category of persons convicted of murder who are eligible for the death penalty." The approval of the Georgia system was grounded on the facts "that the jury" must "find at least one valid statutory aggravating circumstance and ... identify it in writing, and that the state supreme court" must review "the record of every death penalty proceeding to determine whether the sentence was arbitrary or

disproportionate." Thus, there was compliance with "the fundamental requirement that each statutory aggravating circumstance must satisfy a constitutional standard derived from the principles of *Furman* itself." *Id.* at 2742.

To pass the test of constitutionality, each "aggravating circumstance" which the jury found and upon which its decision was based "must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Id.* at 2742–43. "What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Id.* at 2743–44. Since the two valid findings of aggravating circumstances "adequately differentiate this case in an objective, evenhanded, and substantively rational way from the many Georgia murder cases in which the death penalty may not be imposed," the sentence was affirmed. *Id.* at 2744.

In *California v. Ramos,* —— U.S. ——, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), the Court considered whether the California requirement of instructing the jury that a sentence of life imprisonment without possibility of parole may be commuted by the Governor to a sentence which includes the possibility of parole violated the Federal Constitution, as the California Supreme Court had decided. 30 Cal.3d 553, 180 Cal. Rptr. 266, 639 P.2d 908 (1982). In upholding this requirement, the United States Supreme Court noted that

> [i]n ensuring that the death penalty is not meted out arbitrarily or capriciously, the Court's principal concern has been more with the *procedure* by which the State imposes the death sentence than with the substantive factors the State lays before the jury as a basis for imposing death, once it has been determined that the defendant falls within the category of persons eligible for the death penalty.

103 S.Ct. at 3451. Remarking that the instruction in question did "not *limit* the jury

to two sentencing choices," but merely placed an additional factor before the jury for its consideration, the Court distinguished "the guilt/innocence determination" from "the life/death choice," as follows:

> In returning a conviction, the jury must satisfy itself that the necessary elements of the particular crime have been proved beyond a reasonable doubt. In fixing a penalty, however, there is no similar "central issue" from which the jury's attention may be diverted. Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, as did respondent's jury in determining the truth of the alleged special circumstance, the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment.

*Id.* at 3456 (footnote omitted).

Finally, in *Barclay v. Florida,* —— U.S. ——, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983), the accused and a codefendant were convicted of first degree murder. By a seven-to-five vote, the jury recommended that Barclay receive life imprisonment, while, at the same time, recommending death for his cohort. The trial judge, in sentencing Barclay to death, "made written findings of fact," which included findings that three statutory aggravating circumstances existed. Additionally, the judge found that Barclay's "extensive criminal record" also was an "aggravating . . . circumstance," which, in addition to the three statutory criteria, was sufficient to justify imposing the death penalty. He found no mitigating circumstances. *Id.* 103 S.Ct. at 3421. The Florida Supreme Court remanded for a further sentencing hearing in order to give Barclay an "opportunity to rebut ·. . . information [contained] in the presentence report." After conducting the hearing, the trial judge reaffirmed the death sentence for essentially the same reasons. This time the Florida Supreme Court affirmed. 411 So.2d 1310 (1981).

On appeal, the State conceded that the trial judge improperly found that Barclay's

criminal record was an aggravating circumstance because it was not enumerated in the statute, but it argued that the statutory aggravating circumstances were properly found by the trial judge and approved by the state supreme court and these were sufficient to justify the sentence imposed.

The United States Supreme Court affirmed. The plurality opinion concluded that the statutory aggravating circumstances found by the trial judge were "not irrational or arbitrary" as applied to the facts of the case. It also rejected Barclay's complaints concerning certain remarks made by the trial judge in his written findings addressing his own wartime experiences with death. *Id.* 103 S.Ct. at 3423. In doing so, the plurality opinion remarked:

> We have never suggested that the United States Constitution requires that the sentencing process should be transformed into a rigid and mechanical parsing of statutory aggravating factors. But to attempt to separate the sentencer's decision from his experiences would inevitably do precisely that. It is entirely fitting for the moral, factual, and legal judgment of judges and juries to play a meaningful role in sentencing. We expect that sentencers will exercise their discretion in their own way and to the best of their ability. As long as that discretion is guided in a constitutionally adequate way, see *Proffitt v. Florida,* 428 U.S. 242 [96 S.Ct. 2960, 49 L.Ed.2d 913] (1976), and as long as the decision is not so wholly arbitrary as to offend the Constitution, the Eighth Amendment cannot and should not demand more.

The plurality also stated:

> Any sentencing decision calls for the exercise of judgment. It is neither possible nor desirable for a person to whom the state entrusts an important judgment to decide in a vacuum, as if he had no experiences.

*Id.* 103 S.Ct. at 3424.

In a separate opinion concurring in the judgment, Justice Stevens (joined by Justice Powell) noted that, from the beginning, the "constant" standard adopted by the Court "has been emphasis on procedural protections that are intended to ensure that the death penalty will be imposed in a consistent, rational manner." The Court has "stressed the necessity of 'generally narrow[ing] the class of persons eligible for the death penalty,' and of assuring consistently applied appellate review." He interpreted the Florida statute to provide "a 'trifurcated' procedure for identifying the" particular person selected for the death penalty. This consisted of the finding of guilt by the jury, the "advisory sentence" recommendation after the sentencing hearing, and the "actual sentence imposed by the trial judge." *Id.* 103 S.Ct. at 3429. The judge's decision encompassed "three separate determinations": (1) A finding "that at least one statutory aggravating circumstance ha[d] been proved beyond a reasonable doubt; (2) that the . . . statutory aggravating circumstances . . . [were] not outweighed by statutory mitigating circumstances; and, (3) that death is the appropriate penalty for the individual defendant." *Id.* at 3430 (footnotes omitted).

Although the Florida procedure requires a balancing of factors, there is no constitutional requirement to ascribe any particular weight to any particular mitigating evidence or to consider nonstatutory mitigating evidence before the legal threshold is crossed and the defendant is found eligible for the death penalty. Under the Florida procedure this threshold is crossed when the jury finds the defendant guilty; the court determines that one or more of the statutory aggravating circumstances applies; and the court determines that the statutory mitigating circumstances, if any, do not outweigh the statutory aggravating circumstances. The Florida requirement that the statutory aggravating circumstances are

> exclusive affords greater protection than the federal Constitution requires. Although a death sentence may not rest *solely* on a nonstatutory aggravating factor, [citation omitted] the Constitution does not prohibit consideration at the sentencing phase of information not directly related to either statutory aggravating or

statutory mitigating factors, as long as that information is relevant to the character of the defendant or the circumstances of the crime. [Citations omitted.] "What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Id.* at 3432–33, quoting *Zant v. Stephens, supra* 103 S.Ct. at 2743–44.

## V

### A. *Principles Established by Supreme Court*

Analysis of these precedents and other decisions of the Supreme Court reveals certain underlying principles. Clearly the Court considers that the death penalty is unique and that the procedure used to impose it requires a greater degree of judicial scrutiny. Further, the Court's principal concern has been directed more at the procedure itself than at the particular substantive factors which a state provides to the sentencing authority as a basis for imposing capital punishment, once it has been determined that the accused falls within the category of persons eligible for the death penalty.[10] *California v. Ramos, supra.* Such procedures established by the various states must ensure that the death penalty is not meted out arbitrarily or capriciously. *Gregg v. Georgia; Proffitt v. Florida; Jurek v. Texas; Woodson v. North Carolina; Roberts v. Louisiana,* all *supra.*

From the procedures approved by the Supreme Court, the following features appear:

1. A Bifurcated Sentencing Procedure Must Follow the Finding Of Guilt Of a Potential Capital Offense.

2. Specific Aggravating Circumstances Must Be Identified To the Sentencing Authority.

3. The Sentencing Authority Must Select and Make Findings On the Particular Aggravating Circumstances Used As a Basis For Imposing the Death Sentence.

4. The Defendant Must Have Unrestricted Opportunity To Present Mitigating and Extenuating Evidence.

5. Mandatory Appellate Review Must Be Required To Consider the Propriety Of the Sentence As To the Individual Offense and Individual Defendant and To Compare the Sentence To Similar Cases Statewide.

In sum, the sentence must be individualized as to the defendant, and the sentencing authority must detail specific factors that support the imposition of the death penalty in the particular case.

### B. *Application of These Principles in the Military Justice System*

Although the military justice system established by the Uniform Code of Military Justice and implemented by the Manual for Courts-Martial is over 30 years old, it already contains most of the procedural safeguards now mandated by the Supreme Court when the death penalty is to be imposed.

1. A bifurcated sentencing procedure is employed and, during the presentencing proceedings, the court-martial members are instructed by the military judge as to their duties. Paras. 75 and 76*b,* Manual for Courts-Martial, United States, 1969 (Revised edition); Para. 2–37, Military Judges' Benchbook, Department of the Army Pamphlet No. 27–9, May 1982.[11]

10. There is no perfect procedure for deciding in which cases governmental authority should be used to impose death. But a statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments.
*Lockett v. Ohio,* 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978) (plurality opinion).

11. In appellant's case, the judge advised the members in this manner:
 It is the duty of each member to vote for a proper sentence for the offenses that you have found the accused to be guilty of committing.

2. Certain aggravating circumstances, such as premeditation, specific intent, and murder during commission of specified felonies, must be found by the court members—although by only a two-thirds vote. These findings identify the instances in which an accused is eligible for the death penalty (see Jurek v. Texas, supra). After the findings, evidence may be submitted to identify other aggravating circumstances for the members (see Gregg v. Georgia and Proffitt v. Florida, both supra); paras. 73, 74, 75, and 76, Manual, supra.

3. The accused has unlimited opportunity to present mitigating and extenuating evidence; and in his instructions the military judge must identify such evidence to the court members for their deliberations on sentence. See Eddings v. Oklahoma and Lockett v. Ohio, both supra; paras. 75c(1) and 76b(1), Manual, supra.

4. Mandatory review of the facts, the law, and the appropriateness of the sentence in terms of other similar cases—both jurisdiction-wide and service-wide—is provided by the convening authority and by the Courts of Military Review. Mandatory review by this Court is required as to all matters of law. Finally, the President must approve all death sentences; and he may approve any part or amount, commute the sentence as he sees fit, or suspend all or any part of the sentence except the death sentence. Paras. 84–88, 91, 98, 100, 101, 105, and 108, Manual, supra; Articles 60, 64, 66, 67, 71 and 76, UCMJ, 10 U.S.C. §§ 860, 864, 866, 867, 871, and 876, respectively.

Moreover, the military justice system goes even further in providing safeguards in the area of appellate review.[12]

Your determination of the kind and amount of punishment is a grave responsibility requiring the exercise of wise discretion. Although you must give due consideration to all matters in mitigation and extenuation, you must bear in mind that the accused is to be sentenced only for the offenses that you have found him guilty of committing. You must not adjudge an excessive sentence in reliance upon possible mitigating action by the convening or any higher authority.

\* \* \* \* \* \*

The maximum punishment which may be imposed in this case is dishonorable discharge from the armed forces, total forfeiture of all pay and allowances, reduction to the grade of Private E–1, and to be put to death. Additionally, the offense of premeditated murder carries a mandatory minimum sentence of confinement at hard labor for life.

\* \* \* \* \* \*

You are further advised that you should consider all matters in extenuation and mitigation, whether introduced before or after findings. Thus, you should consider evidence admitted as to the accused's age, education, background, training, service record, and family situation. Additionally, you should consider the nature and duration of pretrial restraint, which is pretrial confinement since 1 March of this year. Moreover, the accused in this case has, to the extent allowed by law, entered a plea of guilty. His plea of guilty may be considered by you as a manifestation of repentance and may be the first step towards rehabilitation.

You are advised that although you have found the accused guilty of premeditated murder and rape, and thus mentally responsible and capable of premeditating, you should consider the accused's condition classified as a character and behavior disorder as a mitigating factor tending to explain his conduct, either alone or in connection with his mental deficiency and other factors. Now I refer specifically to matters including but not limited to the testimony of Dr. Reed, and all other evidence relating thereto.

In his dissent in United States v. Matthews, supra at 543, Senior Judge Jones concluded that the instruction did not meet the Manual requirement for "the military judge to tailor his instructions on sentence to the law and to the facts and circumstances of the particular case."

12. The military justice system also provides other safeguards against the "arbitrary or capricious" imposition of the death penalty. The circumstances of the offense are investigated by an officer appointed under the authority of Article 32, Uniform Code of Military Justice, 10 U.S.C. § 832, who must make recommendations as to the level of court-martial to try the case and as to possible punishment levels. The staff judge advocate to the convening authority prepares a pretrial advice giving his recommendations in the same area. See Article 34, UCMJ, 10 U.S.C. § 834. The convening authority exercises his discretion in referring the case to a particular level of court-martial and to the maximum punishment it may impose. Id. All of these steps are to insure that, at least on the basis of evidence available at that point, the accused is within a narrowed class of persons eligible for the imposition of the death penalty and that there is reasonable justifica-

Indeed, appellate government counsel—as well as the Department of Justice and other *amici curiae* supporting appellee's position—argued before this Court that the Uniform Code presently complies with Supreme Court precedents.

### C. Defects in Military Justice System

█ Unfortunately, neither the Code nor the Manual requires that the court members specifically identify the aggravating factors upon which they have relied in choosing to impose the death penalty. Since they provide no insight into their sentencing deliberations, it is impossible upon review to determine whether they have made "an *individualized* determination on the basis of the character of the individual and the circumstances of the crime," and whether they have "adequately differentiate[d] this case in an objective, even-handed, and substantively rational way" from the other murder cases in which the death penalty was not imposed. *Zant v. Stephens, supra* 103 S.Ct. at 2744.

█ The Government contends that the court members' finding that the murder of Mrs. Villaneuva was premeditated narrows the class of murders subject to capital punishment to whatever extent may be required by *Zant v. Stephens, supra.* We disagree. As the Air Force Court of Military Review has observed, Article 118(1) of the Code, which proscribes premeditated murder, "parallels numerous statutes struck down in *Furman* and its companions." *United States v. Gay, supra* at 597. See also *United States v. Kaiser,* 545 F.2d 467 (5th Cir.1977) (invalidating capital punishment provisions of 18 U.S.C. § 1111).

It is especially difficult to justify use of premeditation as the sole aggravating factor which allows a court-martial to impose a death sentence, because in military justice evidence is sufficient to establish premedi-

tation which in some jurisdictions would not suffice for that purpose. Under the military definition,

[p]remeditated murder is murder committed after the formation of a specific intent to kill someone and consideration of the act intended. *It is not necessary that the intention to kill shall have been entertained for any particular or considerable length of time.* When a fixed purpose to kill has been deliberately formed, it is immaterial how soon afterwards it is put into execution. The existence of premeditation may be inferred from the circumstances surrounding the killing.

Para. 197*b,* Manual, *supra* (emphasis supplied).[13] Certainly premeditation as thus interpreted falls far short of "deliberation," which in several state capital punishment statutes is used as an "aggravating circumstance" that limits the class of those subject to capital punishment. *See* § 46–18–303, Montana Code Annotated; Article 37.-071(b)(1), Texas Code of Criminal Procedure.

The Air Force Court of Military Review was also concerned that the finding of premeditation as an element of the crime did not require a unanimous vote of the court members. As they pointed out:

Initially, only two-thirds of the members need concur in findings of guilty. There is no *guarantee* of unanimity at this stage since no procedure exists to discover if any member voted for a finding other than premeditated murder. M.C.M., 1969 (Rev.), para. 74*d*(3).

Later, however, it becomes the duty of each member to vote for a proper sentence for premeditated murder; this is so, regardless of his or her possible earlier vote on findings that the accused is either innocent or guilty of some lesser offense not requiring the forced choice of death or life imprisonment. *See* M.C.M., para.

---

tion for that classification. *See Zant v. Stephens,* —— U.S. ——, 103 S.Ct. 2733, 2742–43, 77 L.Ed.2d 235 (1983). After the case is referred to trial, the court members, the convening authority, the Court of Military Review, this Court, and the President, must also affirmative-

ly find that the sentence is appropriate for imposition on the accused.

13. In *United States v. Teeter,* 16 M.J. 68 (C.M. A.1983), appellant sought unsuccessfully to have this Court overturn this standard.

76*b*(2) and (3) and Article 118, U.C.M.J. At this point, a death penalty sentence must be unanimous. A "hold out" member who voted during findings for other than premeditated murder is compelled to vote the appropriate sentence for a premeditated murderer—without regard to his or her earlier opinion that the accused is not guilty of that specific crime.

It follows that—even assuming that premeditation somehow becomes the military statutory aggravating/narrowing factor—*there is no guarantee that the members found premeditation unanimously.*

16 M.J. at 600.

■ The evidence of record in this case provides ample aggravating circumstances to distinguish it from other murder cases and to justify the imposition of the sentence imposed. However, the lack of specific findings of identified aggravating circumstances makes meaningful appellate review, at any level, impossible, and we cannot be sure that the sentence was correctly imposed. In this regard, we believe the doubts expressed by Justice Blackmun apply here:

> The final result reached by the Florida courts, and now by this Court, in Barclay's case may well be deserved, but I cannot be convinced of that until the legal process of the case has been cleansed of error.... The end does not justify the means even in what may be deemed to be a "deserving" capital punishment situation.

*Barclay v. Florida, supra* 103 S.Ct. at 3446.

## VI

*Presidential Power to Remedy Defects in Sentencing Procedure*

■ Congress obviously intended that in cases where an accused servicemember is convicted of premeditated murder, certain types of felony murder, or rape, the court-

martial members should have the option to adjudge a death sentence. *See* Articles 118 and 120. Probably this intent cannot be constitutionally effectuated in a case where the rape of an adult female is involved, *Coker v. Georgia,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977)—at least, where there is no purpose unique to the military mission that would be served by allowing the death penalty for this offense. Similarly, the imposition of capital punishment in a felony-murder case, where the accused has only aided and abetted the felony may be constitutionally proscribed. *See Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). However, a conviction of premeditated murder can sustain a death sentence if proper sentencing procedures are employed.

We have held that the sentencing procedure in appellant's case was defective because of the failure to require that the court members make specific findings as to individualized aggravating circumstances—findings which can, in turn, be reviewed factually and legally. Congress can take action to remedy this defect that now exists in the sentencing procedure employed by courts-martial in capital cases. However, corrective action also can be taken by the President in the exercise of his responsibilities as commander-in-chief under Article II, Section 2, and of powers expressly delegated to him by Congress. *See* Article 36, UCMJ, 10 U.S.C. § 836.

■ The congressional delegation of powers to the President has traditionally been quite broad in the field of military justice. Pursuant to Article 36 of the Uniform Code, the President promulgates rules to govern pretrial, trial, and post-trial procedures of courts-martial. Unlike other Federal criminal statutes, the punitive articles of the Uniform Code for the most part authorize punishment "as a court-martial may direct"; no maximum or minimum sentence is specified.[14] However, as con-

---

14. Some of the Articles of the Code also authorize punishment by death. *See* Articles 99, 100, 101, 102, 104, 106, 110, 113, 118, and 120, UCMJ, 10 U.S.C. §§ 899, 900, 901, 902, 904, 906, 910, 913, 918, and 920, respectively. Since there is no specific reference to the death penalty in other articles, this penalty is not permit-

templated by Article 56 of the Uniform Code, 10 U.S.C. § 856, the President prescribes maximum punishments for the various offenses. *See* Table of Maximum Punishments, para. 127c, Manual, *supra.*

The great breadth of the delegation of power to the President by Congress with respect to court-martial procedures and sentences grants him the authority to remedy the present defect in the court-martial sentencing procedure for capital cases. *Cf. Youngstown Sheet and Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). Indeed, a proposed revision of the Manual for Courts-Martial, which has been circulated for public comment, contains a rule—R.C.M. 1004—which prescribes special procedures for sentencing in capital cases.

## VII

### A

*Applicability of New Procedures to a Rehearing*

■ As we interpret *Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977), if the President—or the Congress, if it should choose—provides a constitutionally adequate procedure for imposing the death penalty in trials by courts-martial, that procedure could be used in the trial of persons who theretofore had committed premeditated or felony murders. In *Dobbert* the Supreme Court—rejecting a defense claim that a change in the Florida method of adjudging a death sentence could not be applied to Dobbert because of the *ex post facto* limitation—ruled that such a change was only "procedural" in nature. We perceive no distinction between Dobbert's situation and that of a servicemember who commits a premeditated murder and is tried under constitutionally valid procedures prescribed by the President after the date of the crime.

Similarly, we can make no meaningful distinction between the situation of a civilian or military defendant who is validly sentenced under procedures not in effect when he committed a capital crime, and that of an accused who, upon conviction of a capital offense, is sentenced to death under unconstitutional procedures but is then resentenced under constitutionally valid procedures which have been established in the interval. In both instances, the accused knew at the time of the crime that it authorized capital punishment, and that he ran the risk of this penalty.

Thus, if adequate procedures for adjudging death sentences now existed in the military system, Matthews could be resentenced under those procedures, even though they had not existed at the time of his original trial. He could not complain that the punishment was *ex post facto* since, from the outset, Article 118 of the Uniform Code had given him notice of the penalty to which he might be subjecting himself.

### B

*Allowance of Time To Issue New Procedures*

■ In *Northern Pipeline Construction Co. v. Marathon Pipe Line Co., supra,* the Supreme Court created a jurisdictional void by its ruling that the system of bankruptcy courts authorized by Congress in 1978 was unconstitutional. However, the Court delayed its mandate for several months [15] to allow Congress an opportunity for remedial action.

Our ruling in this case also creates a void which must be filled promptly in order to effectuate the congressional intent that court-martial members have the option of imposing a death sentence for certain crimes. As in the *Northern Pipeline* case, it is appropriate to allow a reasonable opportunity for the remedial action to be taken that will effectuate the original congres-

---

ted for the offenses in those articles. *See* Article 18, UCMJ, 10 U.S.C. § 818.

**15.** After an initial delay until October 4, 1982, the Court granted a further delay until Decem-

ber 24, 1982. 458 U.S. 50, 102 S.Ct. 2858, 2880, 73 L.Ed.2d 598 (1982); —— U.S. ——, 103 S.Ct. 200, 74 L.Ed.2d 160 (1982); —— U.S. ——, 103 S.Ct. 662, 74 L.Ed.2d 942 (1982).

sional intent. Thus, if Congress or the President acts promptly to remedy the defect in court-martial sentencing procedure for capital offenses, the Government should be allowed to subject appellant to the death penalty in resentence proceedings that meet the standards of Article 55 and of the Eighth Amendment.

■ Accordingly, we determine that 90 days from the date on which the mandate in this case is issued should be allowed for a change to be made in court-martial sentencing procedures for capital cases. If, during that period, such a change is made, a rehearing on sentence at the trial level with death as the maximum punishment can take place. In any event, the death sentence that has been adjudged must be reversed.

### VIII

#### Execution of Forfeitures

■ We must dispose of one other matter concerning appellant's sentence. The court below concluded that the forfeitures of pay which were adjudged by the court-martial as part of the sentence cannot be executed because appellant was subject to a death sentence. Although the authority to collect forfeitures after the convening authority has approved the sentence is not made expressly applicable by the Uniform Code to cases where a capital sentence has been adjudged, it does exist where there is a sentence to confinement. Since the death sentence generally is viewed as greater than a sentence to life imprisonment—and can be commuted to life imprisonment—we are sure that the power to collect forfeitures after approval of the lesser sentence implies that a similar power exists where the court-martial has adjudged the more severe penalty of death.

### IX

#### Decision

Accordingly, we hold that the death sentence against Matthews was improperly adjudged.

The decision of the United States Army Court of Military Review is reversed as to sentence and the record of trial is returned to the Judge Advocate General of the Army. He may either submit the record to the Court of Military Review which may substitute a sentence of life imprisonment and accessory penalties, or he may return the record to an appropriate convening authority for referral to a general court-martial for a rehearing on sentence if constitutionally valid procedures are provided by the President or Congress within 90 days of the date on which the mandate in this case is issued.

Judge COOK concurs.

FLETCHER, Judge (concurring in the result):

Appellant challenges the constitutionality of his death sentence on the basis of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and its progeny. The majority opinion holds that the procedure for imposing the death penalty which presently exists in the military justice system is constitutionally defective. I decide this case on narrower grounds. The death penalty procedure followed in appellant's case was contrary to Article 55, Uniform Code of Military Justice, 10 U.S.C. § 855, and the sentencing instructions given by the trial judge failed to properly implement paragraph 76b(1), Manual for Courts-Martial, United States, 1969 (Revised edition). Such errors materially prejudiced substantial rights of appellant and his death sentence must be set aside. Article 59(a), UCMJ, 10 U.S.C. § 859(a).

### I

I start my analysis with Article 67(d) of the Code, 10 U.S.C. § 867(d). Congress, in enacting this codal provision, clearly authorized this Court to decide questions of law which arise at courts-martial under the Uniform Code of Military Justice. *Middendorf v. Henry,* 425 U.S. 25, 44, 96 S.Ct. 1281, 1292, 47 L.Ed.2d 556 (1976); *Schlesinger v. Councilman,* 420 U.S. 738, 758–59, 95 S.Ct. 1300, 1313–14, 43 L.Ed.2d 591 (1975); *Noyd*

*v. Bond,* 395 U.S. 683, 694–96, 89 S.Ct. 1876, 1882–83, 23 L.Ed.2d 631 (1969). To the extent that this death penalty case raises questions with respect to various provisions of the Code, this Court must act to effect the will of Congress. In addition, one codal provision, Article 36, UCMJ, 10 U.S.C. § 836, provides that the President by regulation may prescribe modes of procedure in cases before courts-martial.[1] Oftentimes the procedures prescribed are incorporations or modifications of past practices enshrined in old service manuals or vintage military law hornbooks. *E.g., United States v. Davidson,* 14 M.J. 81, 85 (C.M.A.1982); Article 36 also requires that these modes of procedure "may not be contrary to or inconsistent with" the statutory provisions of the Uniform Code of Military Justice. *See* Hearings on H.R. 2498 Before a Subcommittee of the House Armed Services Committee, 81st Cong., 1st Sess., reprinted in *Index and Legislative History, Uniform Code of Military Justice* 1014–19, 1061–64 (1949) [hereinafter cited as *Index and Legislative History*]. To the extent that these executive provisions of military law, technical in nature, conflict with or fail to meet the demands of the Code, this Court must also act to accomplish Congress' will. *Noyd v. Bond, supra;* H. Moyer, *Justice and The Military* § 2:507 (1972), and cases cited therein.

This codal posture leads me to the next question. Is it necessary that the procedure for imposing the death penalty in the military justice system comply with the principles of law articulated in *Furman v. Georgia, supra,* and its progeny? *See Furman v. Georgia, supra* 408 U.S. at 412, 92 S.Ct. at 2815 (Blackmun, J., dissenting); at 417–18 (Powell, J., joined by The Chief Justice and Justices Blackmun and Rehnquist, dissenting); *cf. Schick v. Reed,* 419 U.S. 256, 260, 268, 95 S.Ct. 379, 382, 386, 42 L.Ed.2d 430 (1974). Article 55 prohibits a court-martial from adjudging or imposing "any . . . cruel

or unusual punishment." *See People v. Anderson,* 6 Cal.3d 628, 100 Cal.Rptr. 152, 493 P.2d 880 (Cal.1972). This codal provision was enacted before *Furman v. Georgia, supra.* Yet, there is no indication in its legislative history that the protection to be afforded a servicemember by this Article should be any less than that afforded to his civilian counterpart. *See Index and Legislative History, supra* at 1087–89. In fact, this Court long ago stated concerning Article 55, "Certainly Congress intended to confer as much protection as that afforded by the Eighth Amendment." *United States v. Wappler,* 2 U.S.C.M.A. 393, 396, 9 C.M.R. 23, 26 (1953).

The Supreme Court since *Furman* has made it quite clear that the protection from cruel and unusual punishment clause of the Eighth Amendment extends to the procedure by which the death penalty is imposed and, in a lesser degree, to the substantive factors that a jury may consider in determining whether death is appropriate. *See California v. Ramos,* —— U.S. ——, 103 S.Ct. 3446, 3451–53, 77 L.Ed.2d 1171 (1983). The language employed in Article 55, its legislative history, and our past treatment of this codal provision lead me to conclude that these are also viable concerns for the servicemember.

Another question arises concerning the applicability of *Furman v. Georgia, supra,* and its progeny in light of the "blue-ribbon" nature of the military court of members (i.e., the jury). *Schick v. Reed, supra* 419 U.S. at 260, 95 S.Ct. at 382; *see* Article 25, UCMJ, 10 U.S.C. § 825, Hearings on S. 857 and H.R. 4080 Before a Subcommittee of the Senate Armed Services Committee, 81st Cong., 1st Sess., reprinted in *Index and Legislative History,* S.H. 93–96 (1949). By statute, courts-martial are largely composed of officer members (Article 25(a) and (b)), although enlisted members may now serve on such courts (Article 25(c)). Moreover, since 1920, the requirement has generally

---

1. The framers of the Uniform Code of Military Justice recognized that as a matter of practice the President approves the rules of procedure and modes of proof which are recommended by the services. *See* Hearings on H.R. 2498 Be-

fore a Subcommittee of the House Committee on Armed Services, 81st Cong., 1st Sess., reprinted in *Index and Legislative History, Uniform Code of Military Justice* 1014–16 [hereafter cited as *Index and Legislative History*].

existed that the convening authority detail such members of the armed forces for this duty who "are best qualified . . . by reason of age, education, training, experience, length of service, and judicial temperament." Article 25(d)(2); *see* Article of War 4 (1920); Brown, *The Crowder-Ansell Dispute: The Emergence of General Samuel T. Ansell,* 35 Mil.L.Rev. 1, 21–22 (1967). The officer qualification is rooted in history and tradition and has been reenforced over the years by the continuing structural demands of our military organizations. *See* Schiesser, *Trial by Peers: Enlisted Members on Courts-Martial,* 15 Cath.L.Rev. 171–79 (1966); W. Winthrop, *Military Law and Precedents* 70–80 (2d ed. 1920 Reprint). The latter qualifications are similar to the screening process found in all state systems which separates qualified jurors from a larger group of eligible jurors. *See* Brookshire, *Juror Selection Under The Uniform Code of Military Justice: Fact and Fiction,* 58 Mil.L.Rev. 71, 78, 81, 101 (1972). In this light, military court members, as other individuals, are subject to their own biases, prejudices, and opinions, and must be guided in their discretionary decisions in the same way as civilian jurors. *Id.* at 73.

Does the procedure for imposing the death penalty in the military justice system comport with the principles of *Furman v. Georgia, supra* and its progeny, as incorporated by Article 55, UCMJ? As the Supreme Court has said, "each distinct system must be examined on an individual basis." *See Zant v. Stephens,* —— U.S. ——, 103 S.Ct. 2733, 2741, 77 L.Ed.2d 235 (1983), quoting *Gregg v. Georgia,* 428 U.S. 153, 195, 96 S.Ct. 2909, 2935, 49 L.Ed.2d 859 (1976) (Opinion by Justice Stewart, joined by Justices Powell and Stevens). In this regard it is necessary that the particular features of the military justice system which permit the imposition of the death penalty be clearly delineated.

Appellant was convicted of premeditated murder, in violation of Article 118(1), UCMJ, and rape, in violation of Article 120, UCMJ, 10 U.S.C. §§ 918 and 920, respectively. The first statute requires that appellant be sentenced to "death or imprison-

ment for life as a court-martial may direct." *See also* Article 56, UCMJ, 10 U.S.C. § 856; para. 126, Manual, *supra.* The second statute states that appellant "shall be punished by death or such other punishment as a court-martial may direct." *Cf. Coker v. Georgia,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977).

Two conclusions can be drawn from these penal statutes concerning the military death penalty system. First, the provisions for alternative punishments *reflect the conclusion of Congress* that not all premeditated murderers should die, and all rapists need not suffer the penalty of death. *See In re Anderson,* 69 Cal.2d 613, 73 Cal.Rptr. 21, 447 P.2d 117, 140 (1968) (Tobriner, J., concurring and dissenting). In view of Article 118(4), it also can be said *that Congress did not intend* that all persons who unlawfully kill a human being while "engaged in the perpetration . . . of . . . [a] rape" need receive the death penalty. Second, these statutes impart discretion to a properly administered court-martial to impose the death penalty for these offenses in a particular case. 73 Cal.Rptr. 27–32, 447 P.2d at 123–28 (opinion of the Court).

These statutes, however, do not stand alone in the military justice system. The penalty of death may not be imposed for these offenses by a summary court-martial (Article 20, UCMJ, 10 U.S.C. § 820), by a special court-martial (Article 19, UCMJ, 10 U.S.C. § 819), or by a general court-martial where the convening authority directs that the case be treated as non-capital (Article 18, UCMJ, 10 U.S.C. § 818). *See* Article 49(f), UCMJ, 10 U.S.C. § 849(f). Since it is the convening authority who decides what type of court-martial the above-mentioned charges will be referred to, these statutory provisions impart some "prosecutorial discretion" in death penalty cases. *See generally United States v. Baker,* 14 M.J. 361, 365 (C.M.A.1983). The death penalty also cannot be imposed at a general court-martial composed of members unless all the members concur in the vote for the death penalty. Article 52(b)(1), UCMJ, 10 U.S.C. § 852(b)(1). *Cf.* Article 52(b)(2) and (3).

The requirement of a unanimous verdict was an *attempt by Congress* to conform court-martial practice to that in the Federal Courts. *See Index and Legislative History, supra* at 1082.

The Uniform Code of Military Justice also provides for various levels of post-trial review and approval of the penalty of death if awarded by a court-martial. Under Article 64, UCMJ, 10 U.S.C. § 864, the convening authority has absolute discretion to disapprove this penalty. Under Article 66(c), UCMJ, 10 U.S.C. § 866(c), the Court of Military Review may disapprove this sentence if it "determines, on the basis of the entire record," that it should not be approved. Under Article 67(d), UCMJ, 10 U.S.C. § 867(d), this Court can set aside the death penalty for legal error. Also the President under Article 71, UCMJ, 10 U.S.C. § 871, may disapprove the death penalty in his discretion.

Another part of the military justice system for imposing the death penalty remains to be considered. As earlier mentioned, the President has the power under Article 36 to prescribe modes of procedure at courts-martial. In paragraph 75a, Manual, *supra,* he has provided for a sentence hearing after findings to aid the court in determining the kind and amount of punishment to be imposed. In paragraphs 75b and c, he has authorized the prosecution to present aggravating evidence and the defense to present evidence in extenuation and mitigation. In paragraph 75f, he has authorized argument by counsel to the members of the court-martial. Finally in paragraph 76b(1), he has expressly provided for "instructions ... tailored to the facts and circumstances of the individual case" to be given by the trial judge to the court members. *No separate or distinct procedures are expressly provided in the Manual for death penalty cases. See United States v. Matthews,* 13 M.J. 501, 531 (A.C.M.R.1982).

After careful consideration of the above features of the military death penalty system both fraternally and separately, I conclude that this system does not comply with the demands of *Furman v. Georgia, supra,*

and its progeny. *See generally United States v. Matthews, supra* at 535 (Jones, Sr. J., and Hanft, J., dissenting in part); and at 551 (Garn, J., dissenting in part).

IA

It is well established that the decision of the Supreme Court in *Furman v. Georgia, supra,* broke new ground by emasculating the untrammelled sentencing discretion of a jury in capital cases. *See Gregg v. Georgia, supra* 428 U.S. at 196 n. 47, 96 S.Ct. at 2936 n. 47; *Furman v. Georgia, supra* 408 U.S. at 400–01, 92 S.Ct. at 2809–10 (Chief Justice Burger, joined by Justices Blackmum, Powell, and Rehnquist, dissenting); *see generally,* R. Berger, *Death Penalties* 129, 132 (1982). In the aftermath of *Furman,* there was "a virtual stampede of state reenactments of the death penalty." Ely, *Democracy and Distrust* 65 (1980). *See Roberts v. Louisiana,* 428 U.S. 325, 352–54, 96 S.Ct. 3001, 3014–15, 49 L.Ed.2d 974 (1976) (opinion by Justice White, joined by Chief Justice Burger and Justices Blackmun and Rehnquist, dissenting). Note, *Discretion and the Constitutionality of the New Death Penalty Statutes,* 87 Harv.L.Rev. 1690 (1974). "[T]he legislative history of the Antihijacking Act of 1974 [49 U.S.C. § 1473(c)] reveals Congress' understanding that *Furman* had invalidated the various discretionary death penalty provisions of the federal criminal code," and the subsequently enacted statute was the sole attempt on the part of Congress "to meet the demands of *Furman.*" *United States v. Kaiser,* 545 F.2d 467, 471 (5th Cir.1977). As pointed out by the Court of Military Review, "the Uniform Code of Military Justice and the Manual for Courts-Martial ... have not been amended in response to" *Furman v. Georgia, supra,* and its progeny. *United States v. Matthews, supra* at 530. Therefore, the present military justice procedure for imposing the death penalty was not designed with *Furman v. Georgia, supra,* and the cases that followed as a guide.

Undeterred by these judicial, legislative, and executive realities, the Court of Military Review held that the procedure for

imposing the death penalty in the military justice system nonetheless anticipated and satisfied the concerns of *Furman v. Georgia, supra,* and its progeny. This conclusion implies that, as a result of overabundant concern for the rights of servicemembers or as a result of mere happenstance, a unique system for imposing the death penalty evolved in the military without regard for civilian practice. While such a phenomenon has occurred in the past (*see Miranda v. Arizona,* 384 U.S. 436, 489, 86 S.Ct. 1602, 1635, 16 L.Ed.2d 694 (1966)), no authority has been presented to this Court which suggests that such an enlightened procedure for imposing the death penalty was thought to exist in the military prior to *Furman* or for that matter prior to this case. In reality, the military justice procedure for imposing the death penalty was not considered unique and provided the members of the court-martial with "the same unfettered discretion in sentencing, with the same type of unstructured reference to their conscience as was given" in *McGautha v. California,* 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971). Wall, *Recent Developments—Jury Assessment of the Death Penalty: McGautha v. California,* 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971), 55 Mil.L.Rev. 247, 251 (1972); *see also* Comment, *The Court-Martial As a Sentencing Agency: Milestone or Millstone,* 41 Mil.L. Rev. 81, 84 (1968). A comparison with the California system at issue in *McGautha* confirms my thinking. *See generally* West Annotated California Code, Penal Code (1970).

(1) California Penal Code
§§ 187, 189, 190
The penalty provided for premeditated murder was death or in the alternative life in prison.

(1) Uniform Code, Article
118(1)
The penalty provided for premeditated murder is death or in the alternative life in prison.

(2) California Penal Code
§ 190.1
A bifurcated trial, a guilt stage and a punishment stage, both before the same jury.

(2) Manual for Courts-Martial
Paragraph 75a
A bifurcated trial, a guilt stage and a punishment stage, both before the same jury.

(3) California Penal Code
§ 190.1
At the penalty stage of the trial, the government introduced evidence in aggravation, the defense presented evidence in mitigation, and both were allowed to argue to the jury.

(3) Manual for Courts-Martial
Paragraphs 75b, c, d, f
At the penalty stage of the trial, the government introduced evidence in aggravation, the defense presented evidence in mitigation, and both were allowed to argue to the jury.

(4) CALJIC No. 306.01:
The instructions given by the judge were virtually identical to those given in the *Matthews* case. *See McGautha v. California, supra* at 190–91, 91 S.Ct. at 1458–59. *See generally People v. Durham,* 70 Cal.2d 171, 74 Cal.Rptr. 262, 449 P.2d 198 n. 23 (Cal. 1969).

(4) The trial of Matthews:
The instructions given by the trial judge were virtually identical to those given in *McGautha.* *See* 16 M.J. 377, 378 n. 11 of Chief Judge Everett's opinion.

(5) California Penal Code
Section 1181(7)
The trial judge had the power to reduce the penalty of death to life in prison.

(5) Uniform Code, Article 64
and Article 66
Article 64 — the convening authority need approve only such parts of the sentence as he finds correct in law and fact and as he in his discretion determines should be approved. Article 66 — The Court of Military Review may affirm only a sentence that it finds correct in law and fact, determined on the basis of the entire record.

(6) California Penal Code
§ 1239(b)
There is an automatic appeal to the Supreme Court of the State.

(6) Uniform Code, Article 67
67
There is an automatic appeal to the United States Court of Military Appeals. (There is no direct appeal to any court from a decision of this Court.)

(7) California Constitution
Article 5, § 8
*See* California Penal Code § 4800 *et seq.*
The Governor has the power to commute the death sentence.

(7) Uniform Code, Article 71
The President has the power to commute the death sentence.

---

Although the *McGautha* Court was divided on the Due Process Clause constitutionality of standardless jury sentencing in death penalty cases, it was quite clear that all the justices agreed that the California sentencing procedures imparted absolute discretion to the jury. *E.g., McGautha v. California, supra,* 402 U.S. at 186, 91 S.Ct. at 1456; at 306, 91 S.Ct. at 1517 (Justice Brennan, joined by Justices Douglas and Marshall, dissenting). *See Gregg v. Georgia, supra,* 428 U.S. at 196, n. 47, 96 S.Ct. at 2936 n. 47. The majority opinion also notes that these procedures were characteristic of "most capital trials in this country" at that time. *McGautha v. California, supra,* 402 U.S. at 221, 91 S.Ct. at 1474. Since the military justice system for imposing the death penalty was not only developed prior to *McGautha,* but has remained unchanged since that time, and since it is virtually

identical to these California sentencing procedures[2], I must conclude that it too imparts untrammelled sentencing discretion to the members of a court-martial in capital cases.

The *McGautha*-type sentencing discretion was rejected on cruel and unusual punishment grounds by the decision in *Furman v. Georgia, supra,* and in those cases that followed. *See Gregg v. Georgia, supra* 428 U.S. at 196 n. 47, 96 S.Ct. at 2936 n. 47; *Furman v. Georgia, supra,* 408 U.S. at 310 n. 12, 92 S.Ct. at 2762 n. 12 (Justice Stewart, concurring); 428 n. 11, 92 S.Ct. at 2823 n. 11 (Justice Powell joined by Chief Justice Burger, Justices Blackmun and Rehnquist, dissenting).[3] Systems which were virtually the same as that now promoted by the Government were rejected long ago by the Supreme Court. *See Delgado v. Connecticut,* 408 U.S. 940, 92 S.Ct. 2879, 33 L.Ed.2d

**2.** It is also quite clear that the California Supreme Court agreed that its sentencing procedure prior to 1972 imparted absolute sentencing discretion to the jury in capital cases and failed to meet the requirements of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). *See People v. Jackson,* 28 Cal.3d 264, 168 Cal.Rptr. 603, 618 P.2d 149, 184 (1980) (Bird, C.J., dissenting); *People v. Frierson,* 25 Cal.3d 142, 158 Cal.Rptr. 281, 599 P.2d 587, 605 (1979); *People v. Murphy,* 8 Cal.3d 349, 105 Cal.Rptr. 138, 503 P.2d 594, 596 n. 2 (1972).

**3.** The Supreme Court stayed its mandate in *McGautha v. California* and its companion case, *Crampton v. Ohio,* 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971), to permit consideration of petitions for rehearing in those cases. *See McGautha v. California,* 403 U.S. 951, 91 S.Ct. 2273, 29 L.Ed.2d 862 (1971), and *Crampton v. Ohio,* 403 U.S. 951, 91 S.Ct. 2274, 29 L.Ed.2d 862 (1971). This was the same day

that certiorari was granted in *Furman v. Georgia,* 403 U.S. 952, 91 S.Ct. 2282, 29 L.Ed.2d 863 (1971). On June 7, 1972, the petition for rehearing in *McGautha v. California, supra,* was denied on the basis of *Aikens v. California,* 406 U.S. 813, 92 S.Ct. 1931, 32 L.Ed.2d 511 (1972). *See McGautha v. California,* 406 U.S. 978, 92 S.Ct. 2407, 32 L.Ed.2d 677 (1972). The Supreme Court stated in *Aikens v. California, supra,* that the decision of the California Supreme Court in *People v. Anderson,* 6 Cal.3d 628, 100 Cal.Rptr. 152, 493 P.2d 880 (1972), invalidating the death penalty on state constitutional grounds, removed any realistic threat of execution and rendered moot the federal constitutional question. On June 29, 1972, the Supreme Court granted the petition for rehearing in *Crampton v. Ohio,* 408 U.S. 941, 92 S.Ct. 2873, 33 L.Ed.2d 765 (1972), and vacated the judgment affirming the death penalty on the basis of *Furman v. Georgia, supra.*

764 (1972); *Scoleri v. Pennsylvania*, 408 U.S. 934, 92 S.Ct. 2852, 33 L.Ed.2d 747 (1972). To permit this legal anachronism to be revived ten years after *Furman* would be to return the military justice system to "the dark ages," a course contrary to the intent of Article 55. *See Index and Legislative History, supra* at 1087.

## IB

A slightly different approach to this question, focusing on particular features of the military capital sentencing system, also convinces me that it fails to satisfy the concerns of *Furman v. Georgia, supra*. My Brother Judges are primarily concerned with the failure of the Code and Manual to require court members to specifically identify the aggravating circumstances which they have relied on to impose the death penalty. They hold that such a defect precludes meaningful appellate review and renders the present capital sentencing procedure invalid under *Furman*. I share this concern. *See Zant v. Stephens, supra* 103 S.Ct. at 2761 n. 5 (Marshall, J., dissenting); *People v. Frierson*, 25 Cal.3d 142, 158 Cal. Rptr. 281, 599 P.2d 587, 608–09 (1979). Yet, I also believe a more fundamental flaw exists in the present military capital sentencing system. At the stage of the legisla-

tive definition, the class of convicted murderers eligible for the death penalty is not adequately narrowed for the court members. *See Zant v. Stephens, supra* 103 S.Ct. at 2742–44. *See generally* Gillers, *Deciding Who Dies*, 129 U.Pa.L.Rev. 1, 23–26 (1980).

Article 118 proscribes the crime of murder in the military justice system.[4] It provides that the unlawful killing of a human being without justification or excuse constitutes this offense when this act is done with one of the four states of mind or intents listed in the statute. *See* 96 Cong.Rec. 1307 (1950). "[A] premeditated design to kill" is one criminal state of mind which the court-martial may find to convict a person of murder. Article 118(1). In this context, premeditation is an element of the offense necessary to the guilt/innocence determination of the crime of murder. *See California v. Ramos, supra* 103 S.Ct. at 3456; para. 197 b, Manual, *supra*.[5]

Article 118 also delineates those categories of murder for which the death penalty is authorized. One of the circumstances where a capital murder offense occurs is when the accused had a premeditated design to kill. In this context, premeditation is a factor found at the guilt determination phase of the court-martial which narrows

4. Prior to 1863, a court-martial had no jurisdiction over the offense of murder, unless it directly prejudiced military discipline. W. Winthrop, *Military Law and Precedents* 667 (2d ed. 1920 reprint); G. Davis, *A Treatise on the Military Law of the United States* 439–41 (3rd ed., revised, 1913); *see Ex Parte Mason*, 105 U.S. 696, 698, 26 L.Ed. 1213 (1882). *Cf. United States v. French*, 10 U.S.C.M.A. 171, 27 C.M.R. 245 (1959). In 1863, a specific statute was enacted which permitted a general court-martial "[i]n time of war, insurrection, or rebellion" to punish a person in the military service for murder. Winthrop, *supra* at 666. *See also* Article of War 58 (1874). In 1916, a court-martial was authorized to punish the crime of murder unless the offense was committed during peacetime within the United States. *See* Article of War 92 (1916). In 1951, the above limitations on the jurisdiction of a court-martial to punish a servicemember for murder were removed. Article 118, UCMJ, 10 U.S.C. § 918. *Cf. O'Callahan v. Parker*, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969).

5. Prior to the Elston Act of 1948, "premeditation" was considered by military law to be one of the circumstances in which "malice aforethought" was said to exist. *See* Winthrop, *supra* at 672–73; Davis, *supra* at 445–46. Article of War 92 (1948) generally embraced the delineation of murder by degrees and the use of premeditation as an aggravating circumstance defining first degree murder. *See* Hearings on H.R. 2575 (Elston Act), 80th Cong., 1st Sess., 2127–2128 (1947); *United States v. Roman*, 1 U.S.C.M.A. 244, 249, 2 C.M.R. 150, 155 (1952). Article 118(1) clarified this distinction and recognized a premeditated killing as the classic definition of common law murder or statutory murder in the first degree. *See Index and Legislative History, supra* at 1246–52; *United States v. Calley*, 22 U.S.C.M.A. 534, 540, 48 C.M.R. 19, 25 (1973). This use of premeditation in the development of the law of murder was not unique to the military justice system. *See Woodson v. North Carolina*, 428 U.S. 280, 290–91, 96 S.Ct. 2978, 2984–85, 49 L.Ed.2d 944 (1976); R. Perkins, *Criminal Law* 86–96 (2d ed. 1969).

the categories of murder for which a death penalty may ever be imposed. *See generally Jurek v. Texas,* 428 U.S. 262, 271, 96 S.Ct. 2950, 2956, 49 L.Ed.2d 929 (1976). However, Article 118 further provides that a court-martial may sentence a person found guilty of capital murder to the alternative punishment of imprisonment for life. As indicated earlier, this portion of the statute reflects a decision by Congress that not all premeditated murderers need be sentenced to death, and it imports discretion to the members to determine who should die.[6]

The Supreme Court has stated "that statutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty." *Zant v. Stephens, supra* 103 S.Ct. at 2743. While great deference must be paid to the decisions of the legislature in this regard (*California v. Ramos, supra* at 103 S.Ct. 3452), the Supreme Court has also said that to avoid the evils of *Furman,* "an aggravating circumstance must *genuinely narrow* the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v.*

*Stephens, supra* 103 S.Ct. at 2742–43 (footnote omitted; emphasis supplied). *Cf.* Gillers, *supra* at 28 nn. 120 and 121. Whether a finding of premeditation[7] satisfies the concern of *Furman* and its progeny in this regard has not been expressly decided by the Supreme Court. *See* Pfau and Milhizer, *The Military Death Penalty and The Constitution; There is Life After Furman,* 97 Mil.L.Rev. 35, 50 (1982) [hereafter cited as Pfau and Milhizer]. *Cf.* Gillers, *supra* at 2 n. 2 and at 23 n. 106. The answer depends on whether this standard is "so vague that ... [it] would fail adequately to channel the sentencing decision patterns of juries with the result that a pattern of arbitrary and capricious sentencing *like that found unconstitutional in Furman could occur."* *Zant v. Stephens, supra* 103 S.Ct. at 2742, quoting *Gregg v. Georgia, supra* 428 U.S. at 195 n. 46, 96 S.Ct. at 2935 n. 46 (emphasis supplied).

Not a single post-*Furman* decision from a civilian court has been brought to our attention which would support the Government's contention that premeditation by itself "adequately" or "genuinely" narrows the class of persons eligible for the death penalty as a result of a murder conviction.[8]

---

**6.** In 1863 when murder first became a statutory offense expressly cognizable by courts-martial, Congress stated that its "punishment ... shall not be less than ... [that] provided ... by the laws of the State, Territory, or District" where it was "committed." Winthrop, *supra* at 667; Davis, *supra* at 439. In 1916, Congress provided that the alternative punishment of death or life in prison was required for murder. Article of War 92 (1916); *see Winston v. United States,* 172 U.S. 303, 19 S.Ct. 212, 43 L.Ed. 456 (1899). In 1948, Congress provided that murder be punished as a court-martial directs, unless premeditated, in which case either death or life in prison was required. *See* Hearings on the Elston Act, *supra.* Article 118 provides that premeditated murder and felony murder shall be punished by death or life in prison and that other murders be punished as a court-martial directs. Again the development of this capital punishment system for murder was not unique. *See Woodson v. North Carolina, supra* 428 U.S. at 292–93, 96 S.Ct. at 2985–86.

**7.** Prior to *Furman v. Georgia, supra,* much dissatisfaction was expressed as to the use of premeditation to delineate the class of murders

to which the penalty of death ought to be confined. *See* Bedau, *The Death Penalty in America,* 24–24 (1967 rev. ed.); *American Law Institute, Model Penal Code Tentative Draft No. 9,* 68–70 (1959); Cardozo, *Selected Writings* 382–84 (1947). The Supreme Court expressed similar sentiments in *Woodson v. North Carolina, supra* 291–92, 96 S.Ct. at 2985.

**8.** One commentator has indicated that after *Furman v. Georgia, supra,* four states used premeditation as a statutory aggravating circumstance pertinent to imposing the death penalty. *See* Bedau, *The Death Penalty in America,* Table 2–1–3, p. 37 (3rd ed. 1982). Review of these state statutes today reveals that "lying in wait" or "from ambush" is the specific statutory term employed in these post-*Furman* death penalty systems. *See* Cal.Penal Code § 190.-2(a)15 (1978); Col.Rev.Stat. § 16–11–103(6)(f) (1975); Indiana Code 35–50–2–9(b)3 (1977); Montana Code Annotated, § 46–18–303(4) (1979). This statutory language is generally recognized "as a specific illustration of" premeditation, referring to the particular situation where one's purpose is to take a person unawares. Perkins, *supra* at 90–91.

*Cf. McGautha v. California, supra* 402 U.S. at 207 n. 16, 91 S.Ct. at 1467 n. 16. The Court of Military Review relied on *Jurek v. Texas, supra,* for its conclusion that premeditation could satisfactorily serve this function. *See* English, *The Constitutionality of the Court-Martial Death Sentence,* 21 A.F.L.Rev. 552, 556–70 (1979). Close examination of the *Jurek* decision reveals that this analogy is not well-founded. *See* Comment, *The Death Penalty in Military Courts: Constitutionally Imposed?* 30 U.C. L.A.L.Rev. 366, 396–401 (1982); Pavlick, *The Constitutionality of the U.C.M.J. Death Penalty Provisions,* 97 Mil.L.Rev. 81, 116 n. 195 (1982). A finding of premeditation or its functional equivalent was not employed in the Texas system to categorically narrow the class of murderers eligible for the death penalty. *See generally Zant v. Stephens, supra* 103 S.Ct. at 2741, 2742–43. The necessary circumscription was accomplished when the Texas legislature more narrowly defined capital homicides as intentional and knowing murders committed in five specific and objective situations. *See Jurek v. Texas, supra* 428 U.S. at 269–71, 96 S.Ct. at 2955–56. Instead, a finding of premeditation was employed at the selection stage of the Texas capital sentencing system for the purpose of individually determining whether the death penalty was appropriate for a person already found to be eligible for that penalty. *See Jurek v. Texas, supra* at 272, 96 S.Ct. at 2956. Since unbridled jury discretion is permitted at this stage of the sentencing process (*California v. Ramos, supra* 103 S.Ct. at 3457 n. 22, quoting *Zant v. Stephens, supra* 103 S.Ct. at 2742), *Jurek v. Texas, supra,* cannot be reasonably construed as approving premeditation as a factor which "genuinely narrow[s]" the class of murderers eligible for the death penalty.

The question is not whether premeditation narrows the class of convicted murderers, but whether it "genuinely narrow[s]" this class in the sense intended by *Furman v. Georgia, supra. See* Gillers, *supra* at 26. The dissenting opinion of Senior Judge Jones in the court below grasped this critical distinction. *See United States v. Matthews, supra* at 541–42 (Jones, Sr.J. and

Hanft, J., dissenting in part). There it was pointed out that a large number of convictions under premeditated murder statutes were vacated in the wake of *Furman. E.g., Delgado v. Connecticut* and *Scoleri v. Pennsylvania,* both *supra.* In addition, the lead opinion in *Woodson v. North Carolina,* 428 U.S. 280, 286 n. 4, 96 S.Ct. 2978, 2982 n. 4, 49 L.Ed.2d 944 (1976), characterized a similar statute employing premeditation in this manner as one imparting "unbridled [jury] discretion." As pointed out earlier, the military justice system's use of premeditation as part of its discretionary capital punishment system for convicted murderers was not unique prior to *Furman. See Roberts v. Louisiana, supra* 428 U.S. at 333–34 n. 8, 96 S.Ct. at 3006 n. 8. To hold ten years after *Furman* that the use of premeditation in this same fashion now adequately satisfies its concerns would seriously undermine the vitality of that decision. *See California v. Ramos, supra* 103 S.Ct. at 3456 n. 21. The common-sense import of *Furman* and its progeny is that premeditation is too broad a concept to accomplish the "genuine narrow[ing]" required at the stage of legislative definition to determine the class of convicted murderers eligible for the death penalty. *See United States v. Matthews, supra* at 541 (Jones, Sr. J., and Garn, J., dissenting in part). *See generally* Gillers, *supra* at 23–25.

## II

The final reason for my refusal to affirm the death penalty in appellant's case is the failure of the trial judge to give proper instructions to the court members in accordance with paragraph 76*b*(1), Manual, *supra.* Article 59(a). This provision requires that the trial judge "tailor" his instructions on sentence "to the facts and circumstances of the individual case. . . ." Its purpose is to assist the members in making "an intelligent determination of an appropriate sentence." *See United States v. Wheeler,* 17 U.S.C.M.A. 274, 277, 38 C.M.R. 72, 75 (1967), quoting *United States v. Cleckley,* 8 U.S.C. M.A. 83, 87, 25 C.M.R. 307, 311 (1957) (Quinn, C.J., dissenting). I believe that tai-

lored instructions are particularly important in death penalty cases. *See Godfrey v. Georgia,* 446 U.S. 420, 429–30, 100 S.Ct. 1759, 1765–66, 64 L.Ed.2d 398 (1980). This is especially true in the military justice system where prior to this court-martial the death penalty had fallen into desuetude[9] and the occasions for intelligent decision making by members in this regard were limited. *See English, supra* at 552 n. 2.

It cannot be gainsaid that there was little opportunity for this Court or the Courts of Military Review to examine and analyze the military death penalty system prior to this case. *See Pavlick, supra* at 82 n. 5. Moreover, the voluminous briefs filed in this case are a testament to the fact that a wide divergence of opinion exists among those experienced in military law as to the precise nature of the death deserving decision embraced in this system. In this context, I must assume that the lay court members in appellant's case, who were called upon to make this important decision, were at the very least in need of considerable guidance from the trial judge. *See generally Andres v. United States,* 333 U.S. 740, 765–66, 68 S.Ct. 880, 892–93, 92 L.Ed. 1055 (1948).

Chief Judge Everett has included in his opinion the instructions provided by the trial judge to meet this critical need of the court members. He instructed them that a death penalty could be imposed in this case, that other punishments could be awarded in conjunction with it, and that a unanimous vote was required for any sentence which included the death penalty. Otherwise, he provided them with the standard sentencing instructions applicable in any non-capital court-martial. These instructions cannot reasonably be considered sufficient to satisfy the independent requirement of paragraph 76*b*(1), Manual, *supra,* that the sentencing decision at court-martial be intelligent. Two reasons exist for my conclusion.

First, in an earlier decision of this Court notice was paid to the severity of various punishments, unknown to civilian life, which could be imposed at courts-martial at the discretion of court members. *See United States v. Wheeler, supra* at 276, 38 C.M.R. at 74. There this Court cautioned that "a mere rote instruction on the maximum imposable sentence," *id.* at 277, 38 C.M.R. at 75, would not suffice in those cases where one of these penalties was authorized only because of peculiar circumstances existing in that individual case. *See United States v. Yocom,* 17 U.S.C.M.A. 270, 38 C.M.R. 68 (1967); *United States v. Hutton,* 14 U.S.C.M.A. 366, 34 C.M.R. 146 (1964). The death penalty is not unknown to civilian life, yet it "is unique in its severity and irrevocability." *Gregg v. Georgia, supra* 428 U.S. at 187, 96 S.Ct. at 2931. If a finding of premeditation was the particular aggravating circumstance which permitted the imposition of this severe penalty in appellant's case, the court members similar should have been fully advised of this fact and its bearing on their remaining discretionary determination. *United States v. Wheeler, supra* at 277, 38 C.M.R. at 75. *See United States v. Matthews, supra* at 551 (Garn, J., dissenting in part).

Second, the majority opinion of the Court of Military Review below stated that "we do not read the Supreme Court decisions as requiring that capital sentencing be accomplished by procedures different from non-capital sentencing" if "lesser sentences are imposed with the same care." *United States v. Matthews, supra* at 531. Such a statement ignores the fact that in the military justice system, a unitary sentence is always assessed and, as in the present case, the decisions to award a death penalty is made at the same time that decisions as to lesser punishments are made. *See United States v. Keith,* 1 U.S.C.M.A. 442, 448–49, 4 C.M.R. 34, 40–41 (1952). In this context, "the qualitative difference of death from all other punishments" (*California v. Ramos, supra* 103 S.Ct. at 3451) is clouded, and the greater reliability required in capital sentencing decisions would tend to be diminish-

9. The last military death sentence, prior to appellant's trial on July 3, 1979, was adjudged on January 6, 1965. *See* Pfau and Milhizer, *The* *Military Death Penalty and The Constitution; There Is Life After Furman,* 97 Mil.L.Rev. 35, 79 n. 325 (1982).

ed by the varied tasks before the members. *See Beck v. Alabama,* 447 U.S. 625, 639, 100 S.Ct. 2382, 2390, 65 L.Ed.2d 392 (1980). *See generally* Gillers, *supra* at 46–57. Particular instructions which emphasized the uniqueness and primacy of their death decision could and should have been provided by the trial judge in appellant's case in accordance with paragraph 76*b*(1), Manual, *supra.* Approval of the death penalty in the present case without such instructions would denigrate a well-established principle of military law essential to perpetuation of justice in this legal system.[10]

The majority answered three questions which I do not.

1. I do not find it necessary to reach the question of the authority of this Court to declare an act of Congress unconstitutional.

2. The question of whether the executive or the legislative branch may act to modify the present code so that it comports with Article 55 is not before the Court in this case.

3. The question of the effect of the Supreme Court's decision in *Dobbert v. Florida,* 432 U.S. 282 [97 S.Ct. 2290, 53 L.Ed.2d 344] (1977), on any change to the military justice system is not before the Court in this case.

Accordingly, I hold the death penalty was improperly adjudged in this case, and I vote to reverse the decision of the United States Army Court of Military Review as to the sentence. I would return the record of trial to that court for approval of a sentence of life imprisonment with lesser accessory penalties.

---

**10.** The President specifically directed that tailored sentencing instructions be provided to the members in the 1969 revised edition of the Manual for Courts-Martial. Prior to this time, this Court similarly required the use of tailored sentencing instructions at courts-martial. *United States v. Yocom,* 17 U.S.C.M.A. 270, 273, 38 C.M.R. 68, 71 (1967). Judge Kilday, earlier, most eloquently commented on the reason for tailored instructions:

> We find nothing in the authorities cited to indicate that this Court has even suggested a narrow or grudging course be followed by law officers—or, in special courts-martial, by presidents—in charging court members on the law. The darkness of misunderstanding may obscure the import of certain facts but, when they are scrutinized through the spectacles of intelligence, the truth may more easily emerge. *In short, justice tends to flourish in an enlightened atmosphere. The requirements of the law foster it, and the intent of this Court has always been to encourage that situation.*

*United States v. Smith,* 13 U.S.C.M.A. 471, 474, 33 C.M.R. 3, 6 (1963) (emphasis added).